# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, a Connecticut corporation,<br><br>Plaintiff,<br><br>v.<br><br>AUDAX HEALTH SOLUTIONS, INC., a Delaware corporation, AUDAX HOLDINGS INC., a Delaware corporation, OPTUM SERVICES, INC., a Delaware corporation, and SHAREHOLDER REPRESENTATIVE SERVICES, LLC, a Colorado limited liability company,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 9405-VCP |

## OPINION

Submitted: July 29, 2014
Decided: November 26, 2014

Michael P. Kelly, Esq., Daniel M. Silver, Esq., Benjamin A. Smyth, Esq., McCARTER & ENGLISH, LLP, Wilmington, Delaware; Gregory J. Hindy, Esq., McCARTER & ENGLISH, LLP, Newark, New Jersey; *Attorneys for Plaintiff Cigna Health and Life Insurance Co.*

R. Judson Scaggs, Jr., Esq., Kevin M. Coen, Esq., Frank R. Martin, Esq., Lindsay M. Kwoka, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants Audax Health Solutions, Inc., Audax Holdings, Inc., Optum Services, Inc., and Shareholder Representative Services, LLC.*

**PARSONS, Vice Chancellor.**

In this declaratory judgment action, the plaintiff has moved for judgment on the pleadings, arguing that certain provisions of a merger agreement are contrary to the Delaware General Corporation Law ("DGCL"). Those provisions relate to a release of claims against the acquirer, an indemnification requirement, and the appointment of a stockholder representative. The questions presented are purely legal.

For the reasons that follow, I conclude that the release lacks any force because the buyer attempted to impose that obligation in a contract lacking consideration. I also conclude that the indemnification obligation, which is structured in a manner with few, if any, parallels in the precedent of this Court, violates 8 *Del. C.* § 251. As to the stockholder representative issue, however, I find that the plaintiff failed to brief that issue sufficiently to support its request for judgment as a matter of law.

Accordingly, the plaintiff's motion for judgment on the pleadings is granted in part and denied in part.

## I.   BACKGROUND[1]

### A.   The Parties

All the parties in this case are involved in the healthcare industry. Plaintiff, Cigna Health and Life Insurance Co. ("Cigna"), a Connecticut corporation, offers group health

---

[1]   Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Verified First Amended Complaint for Declaratory and Equitable Relief (the "Complaint"), together with its attached exhibits. For all purposes relevant to this motion, the factual record is undisputed.

benefits to corporations and their employees. Cigna is part of the Cigna family of companies.

Defendant Optum Services, Inc. ("Optum"), a Delaware corporation, offers group health benefits to corporations and their employees. Optum is part of the UnitedHealth Group family of companies, which directly compete with the Cigna companies.

Defendant Audax Health Solutions, Inc. ("Audax" or the "Company"), a Delaware corporation, develops digital health improvement products. Defendant Audax Holdings, Inc. ("Holdings" and, together with Optum, "United") is a Delaware corporation that was formed as an acquisition vehicle. The dispute in this case involves Optum's acquisition by merger—via Holdings—of Audax. Before the merger, Cigna owned 23,105,430 shares of Audax's Series B Preferred Stock.

Defendant Shareholder Representative Services, LLC ("SRS"), a Colorado limited liability company, specializes in distributing merger proceeds and administering escrow accounts. Under the terms of the merger, SRS was designated as the stockholders' representative.

Together, Optum, Audax, Holdings, and SRS comprise the "Defendants" in this case.

### B. The Merger Agreement

A majority of the Audax board of directors approved the merger with Optum on February 10, 2014 (the "Merger"). On or around February 14, 2014, the Merger was approved by written consent of 66.9% of Audax stockholders entitled to vote. Cigna did

2

not vote in favor of the Merger. Defendants consummated the Merger on February 14 pursuant to 8 *Del. C.* § 251.

The written consents were given in the form of Support Agreements.[2] Cigna did not execute a Support Agreement. The Support Agreements included: (1) a release of any claims against United (the "Release Obligation");[3] (2) an agreement to be bound by the terms of the Merger Agreement, specifically including the provisions indemnifying United for any breaches of the representations and warranties (the "Indemnification Obligation");[4] and (3) an appointment of SRS as the Stockholder Representative (the "Stockholder Representative Obligation").[5] The Release Obligation, the Indemnification Obligation, and the Stockholder Representative Obligation (together, the "Obligations") form the crux of this dispute and are described in greater detail *infra*.

Despite the consummation of the Merger, Defendants have refused to pay Cigna its merger consideration. Cigna claims that it is owed slightly more than $46 million.[6]

---

[2]  Unless otherwise specified, defined terms have the same meaning as in the merger agreement, which is attached to the Complaint as Exhibit A [hereinafter "Merger Agreement"].

[3]  Compl. Ex. C § 7.

[4]  *Id.* § 11(b).

[5]  *Id.* § 11(c).

[6]  Audax's Certificate of Incorporation, Compl. Ex. B [hereinafter "Certificate of Incorporation"], sets forth the conditions for redemption of Audax's preferred stock. Upon the happening of a Deemed Liquidation Event, such as the Merger, the preferred stockholders are entitled to receive the greater of: (1) the Preferred Liquidation Amounts, meaning the issue price of the preferred stock plus declared but unpaid dividends; or (2) the pro rata merger consideration paid to the common

3

The terms of the Merger Agreement condition receipt of the merger consideration on (1) surrender of shares and (2) execution of a Letter of Transmittal.[7] The Letter of Transmittal[8] is defined in the relevant part of the Merger Agreement as "a letter of transmittal in form and substance reasonably acceptable to Buyer, pursuant to which, among other things, the Effective Time Holders shall make standard representations and warranties [and] agree with the provisions hereof (including the indemnification provisions set forth in Article VII)."[9] The Letter of Transmittal requires that the Audax stockholder surrendering its shares agree to the Obligations.[10] Cigna's Complaint maintains that the Obligations violate the DGCL and, accordingly, Cigna has refused to execute the Letter of Transmittal. In response, Defendants have refused to pay Cigna its merger consideration.

### C. The Obligations

The Indemnification Obligation makes the former Audax stockholders liable to United, up to the pro rata amount of merger consideration they received, for breaches of

---

stockholders. Here, the merger consideration appears to exceed the Preferred Liquidation Amounts, so the parties have proceeded on the assumption that Cigna's shares are to be exchanged as if they were converted to common stock immediately before the Merger.

[7] Merger Agreement § 2.14.

[8] Compl. Ex. D [hereinafter "Letter of Transmittal"].

[9] Merger Agreement § 1.1. The Effective Time Holders include Cigna.

[10] Letter of Transmittal 3-4.

4

certain of the Company's representations and warranties.[11] The representations and warranties survive the Closing of the Merger and most of them terminate eighteen months after the Closing Date. Certain of the representations and warranties, however, survive longer: the Select IP Matters remain in effect for thirty-six months after the Closing and, more importantly for purposes of Cigna's motion, the Seller Fundamental Representations and Warranties,[12] along with the Indemnification Obligation, survive indefinitely.[13]

The Stockholder Representative Obligation requires the appointment of SRS to act as the stockholders' representative after the consummation of the Merger.[14] In that capacity, SRS's actions are binding upon the former stockholders. SRS is empowered to take all actions specified or contemplated by the Merger Agreement including, as pertinent here, defending and settling any indemnity claims brought by United.[15] According to Cigna, this condition improperly deprives it of the ability to defend against any indemnity claims.

---

[11] Merger Agreement §§ 7.2, 7.4.

[12] These include representations and warranties relating to: corporate organization and good standing, capitalization, authorization to effect the Merger and transactions contemplated thereby, taxes, environmental matters, certain intellectual property items, and brokerage fees. *Id.* §§ 3.1(a), 3.2(a)-(c), 3.3, 3.9, 3.10, 3.13(a) & (f)-(i), 3.18.

[13] *Id.* § 7.1.

[14] *Id.* § 9.18.

[15] *Id.* § 9.18(a)(i)-(ii).

5

Unlike the foregoing obligations, the Release Obligation does not appear in the Merger Agreement. In the case of Cigna, the Release Obligation appears only in the Letter of Transmittal and broadly requires Cigna to release any claims against United, as well as its affiliates, employees, and agents. Subject to a few exceptions, such as liabilities specifically contemplated by the Merger Agreement or unrelated contracts the releasing party may have with United, any stockholder signing the Letter of Transmittal "irrevocably and unconditionally releases, acquits and forever discharges" the Releasees from:

> any and all Losses, debts or rights, whether fixed or contingent, known or unknown, matured or unmatured, arising out of, relating to, or in any manner connected with any facts, events or circumstances, or any actions taken, at or prior to the consummation of the transactions contemplated by the Merger Agreement that any Releasor ever had or now has against the Releasees, including any right, title and interest in and to the Shares.[16]

### D. Procedural History

Cigna filed its initial complaint on February 28, 2014, together with a motion to expedite and a motion for a status quo order. On March 19, the Court granted a stipulated order that gave Cigna ten days following resolution of this action to withdraw its appraisal demand and instead accept the merger consideration. Cigna filed the currently operative Complaint on April 1, 2014. Defendants answered on April 24 and Cigna promptly moved for judgment on the pleadings. Briefing on Cigna's motion

---

[16]     Letter of Transmittal 4.

concluded July 14.[17]   After hearing argument on that motion on July 29 (the "Argument"), I stayed discovery pending its resolution.[18]

### E.    Parties' Contentions

Cigna challenges the Obligations on several grounds.  First, Cigna asserts that the Obligations run afoul of 8 *Del. C.* § 251, which Cigna interprets as requiring the merger consideration be paid upon consummation of the Merger and cancellation of shares.  The additional Obligations, Cigna contends, are barred by the language of Section 251.  Cigna further contends that the Indemnification Obligation violates 8 *Del. C.* § 102(b)(6) and Audax's Certificate of Incorporation.  Absent unusual circumstances—such as a piercing of the corporate veil—or a special provision in Audax's Certificate of Incorporation, Audax's stockholders are not liable for the debts of the corporation.  Cigna argues, therefore, that the Indemnification Obligation is an impermissible attempt to make Audax's stockholders personally liable for the Company's debts.  Finally, Cigna avers that the Obligations are inequitable and contrary to precedent.

In response, Defendants argue that the Indemnification Obligation is the economic equivalent of an escrow provision and that there is no basis for a suggestion that placing a portion of the merger consideration into escrow would be prohibited.  The Indemnification Obligation, according to Defendants, is a permissible post-closing price

---

[17]   Briefing on the motion for judgment on the pleadings consisted of Plaintiff's Opening Brief ("Pl.'s Opening Br."), Defendants' Opposition Brief ("Defs.' Opp'n Br."), and Plaintiff's Reply Brief ("Pl.'s Reply Br.").

[18]   Arg. Tr. 69.

adjustment, as authorized by Section 251 and Delaware precedent. Defendants characterize the merger consideration as a bundle of rights that consists of more than just the cash payment to the stockholders. Because they allege that acceptance of the Obligations affected the price the buyer was willing to pay for Audax, Defendants assert that the Obligations are part of the total mix of consideration. As to Section 102(b)(6) of the DGCL, Defendants state that the Indemnification Provision is not a debt of the corporation, but rather a price adjustment permitted by the more specific statutory provisions in Section 251. Generally, Defendants describe the Obligations as merely variations on common provisions in private-company mergers and suggest that an opinion invalidating the Obligations would produce a negative outcome for stockholders generally and needlessly restrict the freedom of deal architects to craft provisions most suited to the specifics of a given situation.

## II. STANDARD OF REVIEW

Court of Chancery Rule 12(c) provides: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Well-pled facts are accepted as true and construed in the light most favorable to the non-moving party.[19] A party is entitled to judgment on the pleadings when "'there is no

---

[19] *Fiat of N. Am. LLC v. UAW Retiree Med. Benefits Trust*, 2013 WL 3963684, at \*7 (Del. Ch. July 30, 2013).

material fact in dispute and the moving party is entitled to judgment under the law.'"[20]

For purposes of this Opinion, the factual record is undisputed.[21]

### III. ANALYSIS

### A. The Effect of 8 *Del. C.* § 251

Section 251 of the DGCL governs mergers of Delaware corporations. Sections 251(b) and (c) establish a number of mandatory requirements that a merger agreement must satisfy. Cigna contends, among other things, that the Obligations violate Section 251 because the Letter of Transmittal is a contract without consideration and, relatedly, because the Obligations place stockholders in the inequitable position of being forced to choose between uncertain merger consideration and appraisal. Defendants dispute both of these positions.

### 1. Does the Release Lack Consideration?

"It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration. . . . Consideration is 'a benefit to a promisor or a detriment

---

[20]  *In re Seneca Invs. LLC*, 970 A.2d 259, 262 (Del. Ch. 2008) (quoting *Warner Commc'ns Inc. v. Chris-Craft Indus. Inc.*, 583 A.2d 962, 965 (Del. Ch.), *aff'd*, 567 A.2d 419 (Del. 1989)).

[21]  Defendants, in their Answer, raised several equitable defenses to Cigna's claims. These defenses mainly relate to the conduct of Mark Boxer, Cigna's representative on Audax's board of directors. As a general rule, however, equitable defenses will not "bar a claim based upon a violation of express law or public policy." *Wahl v. City of Wilm.*, 1994 WL 13638, at *3 (Del. Ch. Jan 10, 1994); *see also Superwire.com, Inc. v. Hampton*, 805 A.2d 904, 909 n.17 (Del. Ch. 2002) (noting that equitable defenses will not allow the Court to give effect to void shares). Because the rulings reflected in this Opinion are based on a holding that Defendants' violated Section 251, I do not consider Defendants' equitable defenses to be applicable, and do not address them further.

9

to a promisee pursuant to the promisor's request.'"[22]  Cigna argues that, under Section

251, United legally is obligated to pay Cigna its merger consideration, and that the Letter

of Transmittal, therefore, is not an enforceable contract because it lacks separate,

independent consideration.  According to Cigna, payment of the merger consideration

was a pre-existing duty and cannot be the basis for a binding contract between the

parties.[23]  United counters that the Merger Agreement is a bundle of rights, that the

merger consideration includes more than just cash, and that the Obligations constitute

part of the overall consideration.

In relevant part, Section 251 requires that:

> The [merger] agreement shall state . . . The manner, if any, of
> converting the shares of each of the constituent corporations
> into shares or other securities of the corporation surviving or
> resulting from the merger or consolidation, or of cancelling
> some or all of such shares, and, if any shares of any of the
> constituent corporations are not to remain outstanding, to be
> converted solely into shares or other securities of the
> surviving or resulting corporation or to be cancelled, *the cash,
> property, rights or securities of any other corporation or
> entity which the holders of such shares are to receive in
> exchange for, or upon conversion of such shares and the
> surrender of any certificates evidencing them*, which cash,
> property, rights or securities of any other corporation or entity

---

[22]  *James J. Gorey Mech. Contracting, Inc. v. BPG Residential P'rs V, LLC*, 2011 WL 6935279, at *2 (Del. Ch. Dec. 30, 2011) (quoting *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000)).

[23]  *Id.* ("A commitment to honor a pre-existing obligation works neither benefit nor detriment; therefore, '[a] promise to fulfill a pre-existing duty, such as a promise to pay a debt owed, cannot support a binding contract' because consideration for the promise is lacking.") (quoting *First State Staffing Plus, Inc. v. Montgomery Mut. Ins. Co.*, 2005 WL 2173993, at *9 (Del. Ch. Sept. 6, 2005)).

> may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation.[24]

Focusing on the italicized language, Cigna argues that the stockholders' shares are cancelled immediately upon the consummation of a merger and that the stockholders must only surrender their cancelled certificates to receive the merger consideration. For support, Cigna draws on *Roam-Tel Partners v. AT&T Mobility Wireless Operations Holdings Inc.*[25] In that case, then-Vice Chancellor (now Chief Justice) Strine analyzed the issue of the availability of appraisal rights following a short-form merger under 8 *Del. C.* § 253. A minority stockholder executed a letter of transmittal that expressly stated the stockholder was waiving its appraisal rights. The stockholder, within the appropriate statutory time period to seek appraisal, rescinded the letter of transmittal and demanded appraisal. AT&T argued that the minority stockholder waived its appraisal rights by executing the letter of transmittal. In short order, the Court rejected this argument, finding that the letter of transmittal was not a binding contract because it lacked consideration—*i.e.*, the obligation to pay the merger consideration was a pre-existing duty.[26]

---

[24]     8 *Del. C.* § 251(b)(5) (emphasis added).

[25]     2010 WL 5276991 (Del. Ch. Dec. 17, 2010).

[26]     *Id.* at *6 ("AT & T Mobility, having effected a short-form merger in which it cashed out the minority stockholders, had the legal obligation to pay each minority stockholder, in the event that such stockholder did not elect an appraisal, the merger consideration as set forth in a board resolution necessary to effect the short-form merger.").

11

According to Cigna, its right to the merger consideration vested as a matter of law when United consummated the Merger and extinguished Cigna's shares. Thus, there is no consideration that supports the Obligations in the Letter of Transmittal. Further, Cigna contends it is irrelevant that two of the Obligations appear in the Merger Agreement itself because the Obligations contravene Section 251. A detailed textual analysis of Section 251, in Cigna's view, reveals that it requires a two-way exchange in which stockholders lose their shares and receive benefits in response. Section 251(b)(5) allows merger consideration to consist of "cash, property, rights or securities of any other corporation or entity." In its Reply Brief, Cigna relies on the Black's Law Dictionary definitions for each of these terms in arguing that the Obligations run contrary to Section 251 precisely because they are obligations, not benefits.

In response, Defendants emphasize the "wide latitude afforded by Section 251,"[27] but that argument is less than compelling. The flexibility given corporate planners under Section 251 is not unlimited. United could have proceeded with the acquisition through a stock purchase agreement in which it contractually imposed the Obligations on the selling stockholders. Instead, United chose to proceed with a statutory merger under Section 251. That decision has legal significance.[28] Section 251, while allowing for a broad range of merger variations, still requires compliance with its provisions.

---

[27] Defs.' Opp'n Br. 19.

[28] *See, e.g.*, *Orzeck v. Englehart*, 195 A.2d 375, 378 (Del. 1963) ("[T]he general theory of the Delaware Corporation Law is that action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be

12

Under the Merger Agreement, the stockholders' shares were converted into the "right to receive the Applicable Per Share Merger Agreement Consideration in accordance with this agreement."[29]  Defendants advance a "bundle of rights" theory of consideration and seize upon the use of the term "rights" in DGCL § 251 as the apparent textual hook for this theory.  Under this view, the "right" to receive cash for any cancelled shares is subject to the other provisions of the Merger Agreement.  Not implausibly, Defendants contend that the Obligations affected the price United was willing to pay for Audax.  Without the Obligations, the price likely would have been lower.  Consistent with their bundle of rights theory, Defendants distinguish *Roam-Tel* on the grounds that the Obligations here were included in the Merger Agreement, which also referenced the Letter of Transmittal.  According to Defendants, therefore, the Letter of Transmittal is not a new undertaking by the stockholders, but instead is part of the overall scheme of the Merger.

Textually, Defendants are on shaky ground.  The term 'rights' simply could refer to consideration that takes the form of rights authorized by Section 157 of the DGCL.  This reading applies the principle of "in pari materia"[30] and recognizes that 'rights'

---

tested by the requirements of other unrelated sections under which the same final result might be attained by different means.").

[29]  Merger Agreement § 2.6(b)(iii).

[30]  *See*, *e.g.*, *Richardson v. Bd. of Cosmetology & Barbering*, 69 A.3d 353, 357 (Del. 2013) ("The doctrine of *in pari materia* is another well-settled rule of statutory construction.  Under this rule, related statutes must be read together rather than in

appears in a list with terms like cash, property, and securities. Assuming rights has a broader meaning, Black's Law Dictionary provides seven definitions of the term "right," of which six plausibly may be relevant here.[31] All of those six definitions, however, imply a positive benefit, not the undertaking of an obligation or a burden. None of the definitions provide obvious or implicit support for the idea that merger consideration can be made contingent on further undertakings by the stockholders.

Pragmatically, Defendants' bundle of rights argument raises serious concerns. Wholesale adoption of this position seemingly would allow buyers to impose any range of provisions on stockholders as conditions precedent to payment of the merger consideration. One need not look far for a hypothetical, however, because the facts of this case demonstrate the problems with Defendants' argument. The Release Obligation is not mentioned in the Merger Agreement. Rather, the Merger Agreement requires the

---

isolation, particularly when there is an express reference in one statute to another statute.") (internal citations omitted).

[31] BLACK'S LAW DICTIONARY 1436 (9th ed. 2009). Those six definitions are:

> 2. Something that is due to a person by just claim, legal guarantee, or moral principle. . . . 3. A power, privilege, or immunity secured to a person by law. . . . 4. A legally enforceable claim that another will do or will not do a given act; a recognized and protected interest the violation of which is a wrong. . . . 5. (often pl.) The interest, claim, or ownership that one has in tangible or intangible property. . . . 6. The privilege of corporate shareholders to purchase newly issued securities in amounts proportionate to their holdings. 7. The negotiable certificate granting such a privilege to a corporate shareholder. *Id.*

14

Letter of Transmittal to be "in form and substance reasonably acceptable to Buyer" and requires agreement to the indemnification provisions "among other things."[32] Defendants assert that the Release Obligation is "part and parcel of the overall consideration."[33] The Merger Agreement, however, provided no indication to stockholders that they might have to agree to a release, let alone the sweeping release called for in the Letter of Transmittal. If the quoted language above is sufficient to allow inclusion of the Release Obligation, then buyers could impose almost any post-closing condition or obligation on the target company's stockholders after the fact by including it as a requirement in the letter of transmittal. This possibility is particularly troubling in light of the provisions in Audax's Certificate of Incorporation that mandate payment to the preferred stockholders, such as Cigna, in the event of a merger.

Because the Release Obligation is a new obligation Defendants seek to impose on Cigna post-closing, and because nothing new is being provided to Cigna beyond the merger consideration to which it became entitled when the Merger was consummated and its shares were canceled, I find that there is no consideration for the Release Obligation in the Letter of Transmittal. In accordance with *Roam-Tel*, therefore, I hold that the Release Obligation is unenforceable. The Indemnification Obligation and the Stockholder Representative Obligation, however, were included in the Merger Agreement. *Roam-*

---

[32] Merger Agreement § 1.1.

[33] Defs.' Opp'n Br. 32.

15

*Tel*'s application to these two obligations is less clear. Because the parties' briefing focused primarily on the Indemnification Obligation, I turn next to that issue.

### 2. Does the Indemnification Obligation violate Section 251?

Defendants portray the Indemnification Obligation as a variant on a common element of private company mergers whereby the buyer can seek relief for breaches of representations and warranties. It is true that escrow provisions appear quite often in private-company mergers.[34] The DGCL, however, does not provide alternative rules for private-company mergers and public-company mergers. There is only one DGCL and all mergers must comply with its terms.

Defendants repeatedly highlight the purported similarities between the Indemnification Obligation and an escrow arrangement, implying that a decision striking down the former would endanger the latter. Economically, there are many similarities between an escrow provision and an indemnification provision. An escrow mechanism grants the selling stockholders some amount of money (x) and potentially more money depending on whether the buyer succeeds in making any claims (z) against the escrow fund (y), such that the total merger consideration (C) paid to the stockholder is equal to $(x) + ((y) - (z))$. An indemnification obligation works by paying all of the money to the

---

[34]  *See, e.g.*, *In re OPENLANE, Inc.*, 2011 WL 4599662, at *8 (Del. Ch. Sept. 30, 2011) ("Escrows are relatively common in deals for 'private' companies. They are rare in deals for 'public' companies, probably because of the difficulty and expense of multiple stages of payment and perhaps because of shareholder expectations. The Escrow Agreement does not necessarily violate any mandatory standard.").

16

stockholders up front and then making claims against the amount paid such that: (C) = (x) − (z). The total amount paid to the selling stockholders under each scenario theoretically should be the same.[35] Because the stockholders get their money sooner under the indemnification structure, they plausibly may prefer that alternative in that any loss from the time value of money is borne by the buyer.

The case law of this Court contains no indication that an escrow of a portion of the merger consideration, as a general matter, is invalid. Interpreting Section 251 in a manner that would imperil escrow agreements, which are widely understood to be permissible, would be unreasonable.[36] Neither party, however, has supplied the Court with a case construing a merger agreement that included an indemnification structure which, as in this case, places potentially all of the merger consideration at risk for an unlimited period of time. Pushing Defendants' economic equivalence argument to its logical conclusion, the analogous escrow structure would be a 100% indefinite escrow pursuant to which the merger consideration would be released only after the buyer determined it would never make a claim under the Merger Agreement. Such a provision

---

[35] The escrow formula, (C) = (x) + ((y) − (z)), is mathematically equivalent to the indemnification formula, (C) = (x) − (z), because, under the indemnification structure, (y) or the money held back in escrow, is zero.

[36] *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem. Hosp., Inc.*, 36 A.3d 336, 343 (Del. 2012) ("According to the golden rule of statutory interpretation, 'unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result.'") (quoting *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1247 (Del. 1985)).

17

is hard to fathom. In any event, I find unpersuasive Defendants' effort to analogize the Indemnification Obligation to an escrow agreement—along with their implication that a ruling finding the Indemnification Obligation impermissible would imperil commonly used escrow agreements.[37]

Rather than a bundle of rights, the merger consideration here more aptly can be described as cash, subject to an open-ended post-closing price adjustment. Two conceivable methods of adjusting the purchase price post-closing are escrow agreements and indemnification agreements. Indemnification provisions that seek to collect or claw back money already paid to the stockholders are unusual, perhaps because collecting that money is substantially more difficult than drawing from an escrow fund. Indeed, very few Court of Chancery cases even arguably have dealt with non-escrow price-adjustment procedures.[38]

---

[37] Additionally, Plaintiffs advance a colorable argument that there is independent legal significance to the choice of an escrow versus an indemnification or clawback approach. The two-way exchange concept of Section 251, which finds support in *Roam-Tel*, leads to the conclusion that, having endured the burden of having their shares cancelled, stockholders legally are entitled to the corresponding benefits. From this vantage point, an escrow is acceptable because it provides a benefit and the possibility of further benefits, but a clawback leaves stockholders potentially liable for further obligations and, thus, arguably might be impermissible. Because the facts of this case allow a narrower determination, I do not reach the question of whether clawbacks are *per se* invalid under Section 251.

[38] *See Aveta Inc. v. Cavallieri*, 23 A.3d 157, 178 (Del. Ch. 2010) (finding merger's post-closing price-adjustment procedures—which included an earnout, adjustments based on the company's financial statements, and a potential clawback—permissible under 8 *Del. C.* § 251(b), though without substantive comment on the clawback provision); *Nash v. Dayton Superior Corp.*, 728 A.2d 59 (Del. Ch. 1998) (determining court's subject matter jurisdiction over dispute

18

Post-closing price adjustments are permissible if they satisfy the requirements of DGCL § 251. As relevant here, Section 251(b) provides that:

> Any of the terms of the agreement of merger or consolidation may be made dependent upon facts ascertainable outside of such agreement, provided that the manner in which such facts shall operate upon the terms of the agreement is clearly and expressly set forth in the agreement of merger or consolidation. The term "facts," as used in the preceding sentence, includes, but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation.[39]

This Court, in *Aveta*, interpreted the language of Section 251(b) at length and provided a detailed, historical analysis of meaning of that provision, as amended over time, and an analogous provision in 8 *Del. C.* § 151(a).[40] That case involved multiple post-closing price adjustments based on the target company's financial records and included a dispute-resolution mechanism for disagreements between the parties, with a final calculation to be made by an accounting firm.[41] Ultimately, the Court held that the post-closing price-adjustment procedures complied with Section 251(b).[42]

---

about post-closing price adjustment with arbitration procedure), *abrogated by Viacom Int'l Inc. v. Winshall*, 72 A.3d 78 (Del. 2013).

[39]    8 *Del. C.* § 251(b).

[40]    *Cavallieri*, 23 A.3d at 171-78.

[41]    *Id.* at 164-65.

[42]    Both parties seem to interpret the *Aveta* merger agreement as requiring the former stockholders to reimburse the buyer in certain circumstances. The dispute before the Court, however, seems to have revolved around upward, post-closing price adjustments, such as the earnout provisions, for which no clawback would be involved. Nevertheless, language in *Aveta* and its predecessor opinion imply that

19

The Indemnification Obligation differs in significant ways from the procedures approved in *Aveta*, even assuming, *arguendo*, that that case provides support for a clawback provision in a merger agreement. First, the adjustments in *Aveta* were tied to the corporation's financial statements, while the adjustments here depend on any damages that United might suffer. Second, the Indemnification Obligation places potentially all of the merger consideration at risk. Third, the Indemnification Obligation continues indefinitely. *Aveta* did not involve terms comparable to either of these last two characteristics. In this regard, I note that Cigna's primary challenge to the Indemnification Obligation relates to the fact that certain aspects of it are not limited in terms of (1) the amount of money that might be subject to a clawback and (2) time. This Opinion focuses only on those aspects of the Indemnification Obligation.

Defendants argue that the Indemnification Obligation complies with Section 251(b), emphasizing that it defines "facts" as including "a determination or action by any person or body."[43] A judicial opinion in a case about a breach of representations or warranties would seem to fall within that definition. Furthermore, the manner in which such a "fact" would operate on the rest of the agreement seems to be "clearly and

---

a clawback provision existed in the merger. *Aveta, Inc. v. Bengoa*, 986 A.2d 1166, 1174 (Del. Ch. 2009) ("If the Statement of Actual IBNR was greater than the Statement of IBNR . . . the Shareholders were required to make up the difference via a cash payment to Aveta."). It is not clear that the issue litigated in *Aveta* actually would have required the former stockholders to pay back any funds or that the potential clawback provision was at issue in any motion presented to the Court.

[43]   8 *Del. C.* § 251(b).

expressly" set forth in the Merger Agreement: Section VII describes the operation of the Indemnification Obligation at length. In that regard, Cigna's contrary argument that the "facts ascertainable" must turn on objective figures and formulas misstates this Court's precedent and clashes with the clear language of the statute.[44]

Cigna's arguments, however, highlight that the previous cases involving "facts ascertainable," whether in the context of DGCL § 251(b) or § 151(a), generally involved reference to some numerical component. The real issue here is not that the Indemnification Obligation is "impermissibly vague" or "constitute[s] an improper abdication" of the board's duties to determine the merger consideration.[45] Instead, this case raises the novel problem that, despite literally complying with the "facts ascertainable" provision of Section 251(b), the value of the merger consideration *itself* is not, in fact, ascertainable, either precisely or within a reasonable range of values. For that reason, the Indemnification Obligation violates Section 251(b)(5), requiring the Merger Agreement to state "the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive."

In the context of addressing the Release Obligation, I expressed unease with Defendants' "bundle of rights" theory of merger consideration and questioned its textual

---

[44] *Cf. HB Korenvaes Invs., L.P. v. Marriott Corp.*, 1993 WL 205040, at *7 (Del. Ch. June 9, 1993) (interpreting 8 *Del. C.* § 151(a) to allow a determination by the corporation's board of directors as to the fair market value of the company's stock).

[45] *Cavallieri*, 23 A.3d at 178.

basis in Section 251(b)(5). Here, the Indemnification Obligation complies textually with Section 251(b)'s "facts ascertainable" provision, but leaves the stockholders unable to determine what they are receiving as merger consideration. Nominally, the stockholders received their pro rata share of the merger consideration. But, the value of that merger consideration must be discounted based on the possibility that some, or even all, of it may need to be returned to United. As such, the ultimate value of that consideration could range from zero to the full amount of what the individual stockholder received.

Crucially, the stockholders *may never know* the exact value of the merger consideration: there is no point at which the value of the merger consideration definitively can be determined because the Indemnification Obligation continues indefinitely. Presumably, as time goes on, United will be less likely to assert a claim. Even then, however, the safety of the stockholders' money would remain uncertain. Two, five, or ten years after the closing, even accounting for laches or statute of limitations defenses, the stockholders largely remain in the same position as on the day of the Closing: potentially liable to United for up to the entire amount of the merger consideration they received. These issues render the true value of the merger consideration unknowable.[46]

---

[46] I also note in this context that Cigna limited its challenge to the Indemnification Obligation and did not contest the post-closing price adjustment provisions in Section 2.10 of the Merger Agreement. That provision is temporally limited and tied to defined metrics in Audax's post-closing financial statements, such as the Company's tangible net worth, taxes payable, and debt payoff.

This Court previously has expressed its concern over instances where stockholders are placed in the unenviable position of being forced to choose between uncertain merger consideration and pursuing the lengthy and potentially costly route of seeking appraisal rights. In *Nagy v. Bistricer*,[47] a case involving appraisal and breach of fiduciary duty claims asserted by a minority stockholder against the controlling stockholders, then-Vice Chancellor Strine condemned a merger effected by the controllers without the minority stockholder's knowledge. The merger consideration consisted of the shares of another corporation, also owned by the controllers, and the exchange ratio could be adjusted later upon the advice of an investment bank chosen by the acquiring corporation. Additionally, the minority stockholder was provided almost no information that would allow him to place a value, with any degree of confidence, on the shares of the acquiring corporation. The Court found that the delegation to the acquiring company of the authority to select an investment bank was an impermissible abdication of the directors' duty to determine a fair price for the company.[48]

As relevant here, the Court also rejected the defendants' argument that they did not breach their fiduciary duties, under the entire fairness standard, because the minority stockholder had a choice between accepting the merger consideration and seeking appraisal.[49] The Court noted that it was "not aware of any provision in the Delaware

---

[47]     770 A.2d 43 (Del. Ch. 2000).

[48]     *Id.* at 62.

[49]     *Id.* at 63.

23

General Corporation Law that provides a board with the ability to force a minority stockholder to accept the 'gift' of an appraisal remedy without another concrete option. Rather," the Court continued, "the minority stockholder must also be given the alternative of receiving *firm merger consideration* that, in the context of a § 251 merger, has been determined to be fair by the corporation's board of directors."[50]

I do not rest my decision on the idea that United forced Cigna to make an inequitably coercive decision. Instead, I read *Nagy* to suggest that Section 251 requires a merger agreement to set forth determinable merger consideration. There is no point in time at which the merger consideration in this case ever becomes firm or determinable. The stockholders instead are left making expected value determinations—calculations that presumably change over time—as to (a) whether a breach of the representations and warranties exists or is likely to arise; (b) whether United will assert those claims; and (c) the potential damages, including consequential damages, a court might award in the case of any such breach. It is impossible for a stockholder to make these computations with any reasonable degree of precision.

For the foregoing reasons, I conclude that the Indemnification Obligation violates Section 251(b)(5), because it prevents the stockholders from determining the value of the merger consideration. While individual stockholders may contract—such as in the form of a Support Agreement—to accept the risk of having to reimburse the buyer over an indefinite period of time for breaches of the Merger Agreement's representations and

---

[50] *Id.* at 64 (emphasis added).

24

warranties, such a post-closing price adjustment cannot be foisted on non-consenting stockholders. As such, United cannot condition the release of Cigna's merger consideration on a requirement that Cigna agree to the Indemnification Obligation.

### 3. Cigna failed to address adequately the Stockholder Representative Obligation.

Cigna only tangentially challenges the Stockholder Representative Obligation, arguing that it is "inextricably intertwined with the Indemnification Obligation."[51] Given my preceding determination as to the invalidity of the Indemnification Obligation, Cigna's challenge would seem to fall away. The propriety of stockholder representatives under the DGCL is the subject of active and ongoing debate. Any determination as to the validity of the Stockholder Representative Obligation based on the current briefing would be unwise. I conclude, therefore, that the issue of the enforceability of the Stockholder Representative Obligation cannot be decided on the current factual and legal record. Accordingly, I deny Cigna's motion for judgment on the pleadings to the extent it challenges the Stockholder Representative Obligation.

### B. Does the Indemnification Obligation Impermissibly Make the Stockholders Liable for the "Debts" of Audax?

Cigna further argues that the Indemnification Obligation runs afoul of 8 *Del. C.* § 102(b)(6). Above, I concluded that the Indemnification Obligation does not comply with Section 251. For the sake of completeness, I briefly address Cigna's 102(b)(6) argument. The Indemnification Obligation raises questions under Section 102(b)(6),

---

[51]     Pl.'s Opening Br. 18 n.16.

because, in the Merger Agreement, the Indemnification Obligation is structured like an indemnification obligation and not like a post-closing price adjustment. Taking Defendants' "price adjustment" argument at face value, however, principles of statutory interpretation lead me to conclude that, in the context of a merger, Section 251, as the more specific provision, governs instead of Section 102(b)(6). Thus, in the end, the challenge under Section 102(b)(6) simply leads back to the Section 251 analysis carried out in the preceding section of this Opinion.

"The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations."[52] Indeed, limited personal liability is one of the core benefits of creating a separate business entity. Only in unusual circumstances are the stockholders of a corporation liable for the debts of the corporation. A Delaware corporation can include in its Certificate of Incorporation a provision making its stockholders liable for the corporation's debts. Absent such a provision, stockholders are not liable for the debts of the corporation except by reason of their own actions.[53] Few corporations choose to include such a provision and there is virtually no case law on

---

[52] 18 AM. JUR. 2d *Corporations* § 46 (West 2014); *see also* 18 C.J.S. *Corporations* § 1 (West 2014) ("A 'corporation' is an incorporeal creature of the law whose constituent members usually are able to take legal shelter under its protective shield of limited liability.").

[53] 8 *Del. C.* 102(b)(6) ("[T]he certificate of incorporation may also contain . . . A provision imposing personal liability for the debts of the corporation on its stockholders to a specified extent and upon specified conditions; otherwise, the stockholders of a corporation shall not be personally liable for the payment of the corporation's debts except as they may be liable by reason of their own conduct or acts.").

8 *Del. C.* § 102(b)(6). Any desire for increased stockholder liability appears confined to academia.[54]

Audax's Certificate of Incorporation does not include the provision authorized by Section 102(b)(6).[55] Cigna argues that this very absence renders the Indemnification Obligation illegal. This theory relies on the fundamental idea that Audax is a separate legal entity from its stockholders.[56] The Merger Agreement, though approved by Audax's board of directors and Audax's stockholders, still remains a contract between Audax and the acquiring company.[57] Any breach of the representations and warranties in the Merger Agreement, Cigna argues, is nothing more than a breach of contract *by Audax*. If Audax breaches a contract, the counterparty to the contract has a claim against Audax. Assuming a breach and a successful suit reduced to judgment, that judgment would be a debt of Audax. The Indemnification Obligation, however, requires *the stockholders* to indemnify United for any such breaches. To complete the argument, while Audax could have made its stockholders liable for its debts under Section

---

[54]    *See, e.g.*, Henry Hansmann & Reinier Kraakman, *Toward Unlimited Shareholder Liability for Corporate Torts*, 100 YALE L.J. 1879 (1991).

[55]    *See generally* Certificate of Incorporation (in which such a provision is not found).

[56]    *See, e.g.*, 8 *Del. C.* §§ 122, 314; *see also supra* note 52 and accompanying text.

[57]    *See* 8 *Del. C.* § 251(a) ("Any 2 or more corporations existing under the laws of this State may merge into a single corporation, which may be any 1 of the constituent corporations or may consolidate into a new corporation formed by the consolidation, pursuant to an agreement of merger or consolidation, as the case may be, complying and approved in accordance with this section.").

102(b)(6), it did not. As a result, Cigna contends, the Indemnification Obligation violates both Audax's Certificate of Incorporation and Section 102(b)(6).

Neither party cited any relevant case law on this issue. The Court's own review of the case law similarly confirms the absence of relevant precedent. Seemingly, this is a novel argument and, at first glance, at least, has some appeal. The problem with Cigna's argument is that Section 102(b)(6) does not exist in isolation. For instance, 8 *Del. C.* § 251 governs merger agreements and expressly allows the terms of a merger agreement to be contingent on facts outside of the agreement.[58] Section 251 also is the more specific of the two provisions. As a general rule of interpretation, more specific provisions trump more general ones.[59] Section 102(b)(6), which allows any corporation to insert a stockholder liability provision into its certificate of incorporation, is more general than Section 251, which deals exclusively with mergers between corporations. The Indemnification Obligation arose in the context of a Section 251 merger. That provision therefore governs, not Section 102(b)(6).

---

[58]     8 *Del. C.* § 251(b) ("Any of the terms of the agreement of merger or consolidation may be made dependent upon facts ascertainable outside of such agreement, provided that the manner in which such facts shall operate upon the terms of the agreement is clearly and expressly set forth in the agreement of merger or consolidation.").

[59]     *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 901 (Del. 1994) (noting the "rule of statutory construction that specific provisions should prevail over general provisions") (citing *Mergenthaler v. State*, 239 A.2d 635, 637 (Del. 1968)).

28

Again, the parties dispute the holding of *Aveta Inc. v. Cavallieri*. That case interpreted Section 251(b) to permit a post-closing price adjustment.[60] *Aveta* might be read to have approved a clawback under Section 251(b), but that issue received minimal attention from the Court. Regardless, the absence of definitive precedent on whether Section 251(b) allows a clawback from the stockholders simply means the question is unsettled. It does not mean that the analysis should proceed instead under Section 102(b)(6). Having concluded for the reasons stated above that the Indemnification Obligation violates Section 251, therefore, I consider it unnecessary to address Cigna's remaining challenge under Section 102(b)(6).

### C.     Does the Indemnification Obligation Violate Audax's Certificate of Incorporation?

Cigna also argues that the Indemnification Obligation violates Cigna's rights as a preferred stockholder under Audax's Certificate of Incorporation. The Certificate of Incorporation prohibits Audax from effectuating a merger unless the preferred stockholders are paid in accordance with the provisions of Section 2 of that document.[61] Section 2.4 requires that the preferred stockholders receive the greater of the preferred

---

[60]     *Cavallieri*, 23 A.3d at 171-78 (interpreting Puerto Rico's version of Section 251, which tracks Delaware's provision, and concluding that the post-closing price adjustment was permissible).

[61]     Certificate of Incorporation § 2.5.2 ("The Corporation shall not have the power to, and shall not, effect a [merger] . . . unless the agreement or plan of merger or consolidation for such transaction . . . provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in accordance with Section 2.").

stock's liquidation preference or "the amount of cash, securities or other property to which such holder would be entitled to receive . . . with respect to such shares if such shares had been converted to Common Stock."[62]

At the Argument, counsel for Defendants stated that, based on the facts of record, it appears that the liquidation preference of Cigna's preferred stock is about $21 million.[63] Cigna did not dispute that estimate or offer a contrary figure. Thus, Cigna presumably would be due the value of its shares as if they had been converted to common stock.

Cigna contends that Section 2.4 requires United to pay Cigna the cash received by the common stockholders *without* the Obligations. Cigna further asserts that the Indemnification Obligation must be stricken because otherwise the final payout to it based on the value of its shares as converted might be less than the preferred liquidation preference. The Certificate of Incorporation created a procedure whereby the preferred stockholders received a minimum amount in the event of a merger, the preferred liquidation preference, but would receive more money if the common stockholders' payout exceeded that liquidation preference.

Section 2.4 requires the preferred stockholders to receive the "cash, securities or other property to which such holder *would be entitled to receive*"[64] if the preferred shares

---

[62]     *Id.* § 2.4.

[63]     Arg. Tr. 52.

[64]     *Id.* (emphasis added).

were converted to common stock. The common stockholders, according to the Merger Agreement, were entitled to receive the per-share merger consideration, *subject to* the Indemnification Obligation. Assuming that the Obligations are valid, the ultimate merger consideration could be less than what was paid at the closing. Having concluded, however, that the Indemnification Obligation violates Section 251 because it makes ascertaining the value of the merger consideration impossible and is therefore unenforceable against Cigna, there is no longer any actual controversy between Cigna and Defendants as to whether the merger consideration legally could fall below the mandatory liquidation preference. Even if the Indemnification Obligation were valid, Cigna would not have a ripe claim on this issue because no facts have been alleged that suggest the merger consideration for Cigna is likely to fall beneath the liquidation preference at any time in the near future, if ever.

Thus, I conclude that my holding that the Indemnification Obligation violated 8 *Del. C.* § 251 rendered moot the issue of whether it also violated the Certificate of Incorporation. Moreover, even if the Indemnification Obligation were valid under the DGCL, it is not clear that Cigna's challenge to that provision under Audax's Certificate of Incorporation would be ripe.

### D.     Limits of This Opinion

Post-closing price adjustments that could require individual stockholders to repay part of their merger consideration occupy an uncertain status under Delaware law. Section 2.10 of the Merger Agreement provides a limited, unchallenged example of such a provision. The Indemnification Obligation, however, places at risk potentially all of the

31

merger consideration a stockholder receives and does so indefinitely. As such, a stockholder cannot know the real value of what she receives at the closing and a Merger Agreement that establishes such a scheme does not satisfy the requirement of DGCL § 251(b)(5) that a merger agreement set forth "the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive." Read as a whole, Section 251 requires that stockholders be able to ascertain the value, at or about the time of the merger, of what they will receive as merger consideration. That requirement is not met in this case.

This is a limited holding. This Opinion does not concern escrow agreements, nor does it rule on the general validity of post-closing price adjustments requiring direct repayment from the stockholders. This Opinion does not address whether such a price adjustment that covers all of the merger consideration may be permissible if time-limited, or whether an indefinite adjustment period as to some portion of the merger consideration would be valid. I hold only that the combination of these factors present in this case— indefinite length and the contingent nature of the entirety of the consideration—renders the value of the merger consideration unknowable and, therefore, violates Section 251.

## IV. CONCLUSION

For the foregoing reasons, Cigna's motion for judgment on the pleadings is granted in part and denied in part. Specifically, I conclude and hereby declare that the Release Obligation found in the Letter of Transmittal is unenforceable because it is not supported by consideration. I also hold that the Indemnification Obligation, to the extent

32

it is not subject to any monetary cap or limit and is not limited in temporal duration,[65] violates 8 *Del. C.* § 251 and is void and unenforceable against Cigna. Plaintiff's motion is denied as to those aspects of the Indemnification Obligation that are limited in both those respects. Accordingly, I hereby declare that Cigna is entitled to tender its shares of Audax stock and receive merger consideration without accepting or being bound in any way by the aspects of the Indemnification Obligation in Section VII of the Merger Agreement that are not subject to a monetary cap and a time limit of 36 months or less.

As to Cigna's challenge to the validity of the Stockholder Representative Obligation, Cigna failed to demonstrate that it was entitled, as a matter of law, to the judgment on the pleadings it seeks. Therefore, that aspect of Cigna's motion is denied.

**IT IS SO ORDERED.**

---

[65] The longest specified time period regarding any portion of the Indemnification Obligation appears to be 36 months. This Opinion is without prejudice to any argument either Cigna or Defendants might make in future proceedings as to aspects of the Indemnification Obligation that are limited to 36 months or less.