# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SJUNDE AP-FONDEN,<br><br>Plaintiff,<br><br>v.<br><br>ACTIVISION BLIZZARD, INC., ROBERT KOTICK, BRIAN KELLY, ROBERT MORGADO, ROBERT CORTI, HENDRIK HARTONG III, CASEY WASSERMAN, PETER NOLAN, DAWN OSTROFF, BARRY MEYER, REVETA BOWERS, KERRY CARR, MICROSOFT CORPORATION, and ANCHORAGE MERGER SUB INC.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 2022-1001-KSJM

## MEMORANDUM OPINION

Submitted: November 30, 2023
Decided: February 29, 2024

Michael Hanharan, Stacey A. Greenspan, Corrine Elise Amato, Kevin H. Davenport, Christine N. Chappelear, PRICKETT, JONES, & ELLIOTT, P.A, Wilmington, Delaware; Lee D. Rudy, Eric L. Zagar, J. Daniel Albert, KESSLER TOPAZ METZLER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff Sjunde AP-Fonden.*

Edward B. Micheletti, Lauren N. Rosenello, Michelle L. Davis, Peyton V. Carper, Claire K. Atwood, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Activision Blizzard, Inc., Robert Kotick, Brian Kelly, Robert Morgando, Robert Corti, Hendrik Hartong III, Casey Wasserman, Peter Nolan, Dawn Ostroff, Barry Meyer, Revetea Bowers, Kerry Carr.*

Elena C. Norman, Daniel M. Kirshenbaum, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Stephen B. Blake, Laura Lin, SIMPSON THATCHER & BARTLETT LLP, Palo Alto, California; Sareen K. Armani, SIMPSON THATCHER & BARTLETT LLP, Los Angeles, California; *Counsel for Defendants Microsoft Corporation and Anchorage Merger Sub.*

**McCORMICK, C.**

This action arises from the merger by which Microsoft Corporation acquired Activision Blizzard, Inc. The plaintiff, which owned stock in Activision, claims that the defendants violated multiple provisions of the Delaware General Corporation Law (the "DGCL") governing board negotiation and board and stockholder approval of merger agreements. The defendants moved to dismiss these claims, and this decision grants the motion in part and denies it in part.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Amended Class Action Complaint (the "Amended Complaint") and the Supplement to the Verified Amended Class Action Complaint (the "Supplemental Complaint") and the documents they incorporate by reference.[1]

Activision develops and publishes interactive entertainment content and services. Microsoft, a leading developer of software, services, devices, and solutions, was one of Activision's largest customers for over two decades. Microsoft approached Activision about a potential strategic combination in November 2021.

The Activision Board of Directors (the "Board") met on December 3, 2021, to discuss the outreach. Activision's financial advisor, Allen & Company LLC, and legal advisor, Skadden, Arps, Slate, Meagher & Flom LLP, were present at the meeting. After the meeting, Activision received unsolicited overtures from other companies, and the Board authorized management to contact other potential acquirers. On

---

[1] C.A. No. 2022-1001-KSJM, Docket ("Dkt.") 19 ("Am. Compl."); Dkt. 27 ("Supp. Compl.").

December 20, 2021, however, Activision and Microsoft agreed to a purchase price of $95 per share and entered into an exclusivity agreement. The parties negotiated key points over the ensuing weeks. The Board met many times over that period with its financial and legal advisors in attendance. The Board received briefings on key terms and the status of negotiations.

On January 17, 2022, the Board met to approve the merger. In advance of the meeting, the Board received a then-current draft of the merger agreement (the "Draft Merger Agreement"). The Board approved the Draft Merger Agreement at the meeting.

The Draft Merger Agreement did not include: the company disclosure letter ("Disclosure Letter"), which was still being drafted and which was mentioned 45 times in the Draft Merger Agreement; disclosure schedules ("Disclosure Schedules"), which were still being negotiated; or the certificate of incorporation for the surviving corporation (the "Survivor's Charter"). The Draft Merger Agreement did not state the amount of consideration and did not list Activision as the target; instead, it included placeholders ("[●]" and "[Denali[,]" respectively).[2]

The Draft Merger Agreement also failed to address dividends. The parties knew that it might take years or more to obtain the regulatory approvals needed to close the merger. One "key open issue" after the January 17 Board meeting, therefore, was the amount of 2022 and 2023 dividends that Activision could pay while

---

[2] Am. Compl. ¶ 167.

the deal was pending.[3] During the January 17 Board meeting, the Board delegated this issue to an *ad hoc* committee of the Board comprising Activision directors Robert Morgado, Brian Kelly, and Robert Corti. Activision CEO Robert Kotick and the *ad hoc* committee ultimately reached an agreement limiting Activision, while the deal was pending, to "one regular cash dividend on the Company Common Stock in the amount pers share of Company Common Stock not in excess of $0.47" (the "Dividend Provision").[4]

The Board did not review or approve any version of the merger agreement after January 17, 2022. The parties executed the merger agreement on January 18, 2022 (the "Merger Agreement"). In final form, it contained several changes from the Draft Merger Agreement, including the Dividend Provision.

The Merger Agreement provided for an initial termination date of January 18, 2023, which was subject to two automatic extensions pending receipt of regulatory approvals. With the extensions, the outside termination date was July 18, 2023.

Activision filed a proxy statement (the "Proxy Statement") seeking stockholder approval of the merger on March 21, 2022. The Proxy Statement disclosed that Defendants expected to close the merger by the end of Microsoft's fiscal year ending June 30, 2023. The Proxy Statement purported to attach the Merger Agreement as Annex A. But Annex A did not contain the Disclosure Letter, Disclosure Schedules, or the Survivor's Charter. Stockholders approved the merger at the special

---

[3] *Id*. ¶ 168.

[4] *Id*.

stockholder meeting on April 28, 2022, with more than 98% of stockholders present voting in favor.

The merger faced antitrust scrutiny during the summer of 2022. The British competition authority launched an investigation on September 15, 2022. The European Commission announced an investigation on November 8, 2022. The Federal Trade Commission ("FTC") issued an administrative complaint initiating an antitrust proceeding on December 8, 2022. On the day that the FTC filed suit, December 8, Kotick announced in a letter to employees that Activision intended to continue to pursue the merger and that he was confident that the merger would close. The FTC trial was scheduled for August 2, 2023, but the commission withdrew its suit in July 2023.

Meanwhile, on November 3, 2022, Plaintiff Sjunde AP-fonden ("Plaintiff"), an Activision stockholder, filed this action against the Board (the "Activision Defendants"), Microsoft, its Board of Directors, and the merger subsidiary (the "Microsoft Defendants," and together with the Activision Defendants, "Defendants"). Plaintiff claimed that Defendants violated Sections 251 and 141 of the DGCL, and asserted clams for conversion, breach of fiduciary duty, aiding and abetting, and conspiracy.

Plaintiff amended its complaint on January 25, 2023, to add allegations concerning regulatory developments in the U.K. and the U.S. Plaintiff also added a count for breach of fiduciary duties on the speculation that Defendants had agreed or acquiesced to extending the July 18, 2023 outside termination date. Defendants had

4

not extended the outside termination date at the time that Plaintiff filed the Amended Complaint. Plaintiff inferred that Defendants had agreed to extend the deadline, or acquiesced to doing so, based on Kotick's December 8 announcement to employees stating his continued commitment to the merger. Plaintiff supplemented the Amended Complaint on March 2, 2023, to add allegations concerning the U.S. and European regulatory investigations.

Defendants moved to dismiss the action and stay discovery on June 5, 2023.[5] On June 13, 2023, Plaintiff opposed the motion and moved for partial summary judgment.[6] The parties agreed to a bifurcated briefing schedule that addressed the parties' competing motions as to Plaintiff's claims under Sections 251 and 141 of the DGCL, as well as an attendant claim of conversion.[7]

On July 18, 2023, while the parties were negotiating the briefing schedule, Activision and Microsoft executed a "Letter Agreement," which waived Microsoft's and Activision's rights to terminate the Merger Agreement prior to October 18, 2023.[8] Activision also waived any right to a termination fee during this extension period, which, if payable under the Merger Agreement, was increased to $3.5 billion after August 29, and to $4.5 billion on September 15. Microsoft waived the forbearance covenant in Section 5.2(e)(B)(y) of the Merger Agreement, permitting Activision to

---

[5] Dkt. 72.

[6] Dkt. 75.

[7] Dkt. 83.

[8] Dkt. 82.

pay one regular cash dividend for fiscal year 2023 of common stock in an amount per share up to $0.99, prior to and not contingent on closing. Plaintiff did not supplement its pleading to add allegations concerning the Letter Agreement.

In the middle of briefing, the merger cleared the regulatory hurdles. The merger closed on October 13, 2023.[9] The parties completed briefing on the motions on November 7, 2023, and the court heard oral argument on those motions on November 30, 2023. This decision resolves aspects of Defendants' motion to dismiss. This decision does not address: Defendants' motion to dismiss Plaintiff's claim under Section 251(c)(7);[10] the Microsoft Defendants' motion to dismiss; or Plaintiff's motion for partial summary judgment.

## II. LEGAL ANALYSIS

Plaintiff claims that Defendants violated Section 251(b), Section 251(c), Section 251(d), and Section 141 of the DGCL. Plaintiff also claims that its shares were unlawfully converted due to the statutory violations.[11]

Defendants have moved to dismiss these claims pursuant to Court of Chancery Rule 12(b)(6). Under Rule 12(b)(6), "the governing pleading standard . . . is

---

[9] Dkt. 97.

[10] 8 *Del. C.* § 251(c)(7) ("In lieu of filing the agreement of merger or consolidation required by this section, the surviving or resulting corporation may file a certificate of merger or consolidation, executed in accordance with § 103 of this title, which states . . . [t]hat a copy of the agreement of consolidation or merger will be furnished by the surviving or resulting corporation, on request and without cost, to any stockholder of any constituent corporation.").

[11] For convenience, this decision refers to each of Plaintiff's theories under the separate statutory provisions and for conversion as "claims," although they are all mushed together in Count I of the Amended Complaint.

reasonable 'conceivability.'"[12]  When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[13]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[14]

Plaintiff's claims require the court to interpret provisions of the DGCL.  The "most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it."[15]  The court must give statutory words their commonly understood, plain meaning.  "[I]f a statute is unambiguous, there is no need for judicial interpretation, and the plain meaning of the statutory language controls."[16]  The unambiguous language of the statute is "paramount" when

---

[12] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[13] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[14] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[15] *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.,* 73 A.3d 934, 950 (Del. Ch. 2013) (citing *New Cingular Wireless PCS v. Sussex Cty. Bd. of Adjustment,* 65 A.3d 607, 611 (Del. 2013)).

[16] *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999) (citation omitted).

discerning legislative intent.[17] The court should also construe statutes in a way that promotes "its apparent purpose and harmonize[s] with other statutes."[18]

## A.    Section 251(b)

Plaintiff alleges that Defendants violated Section 251(b) of the DGCL, which requires a board to adopt a resolution approving an "agreement of merger" compliant with Section 251(b), because the Draft Merger Agreement did not include terms required by Section 251(b). Defendants respond that "while Section 251(b) identifies information that must be in the agreement," it does not require that such information be included in the version approved by board resolution.[19]

To determine whether the Board's approval of the Draft Merger Agreement complied with Section 251(b), the court must determine exactly what a board must approve under Section 251(b).

Plaintiff interprets Section 251(b) to require a board to approve an execution-version of a merger agreement (the "execution-version interpretation"). Plaintiff bases the execution-version interpretation foremost on the plain language of Section 251(b). The first sentence states: "The board of directors of each corporation which desires to merge . . . *shall* adopt a resolution approving *an agreement of merger* . . . and declaring its advisability."[20] The second sentence identifies what "*the agreement*

---

[17] *CHC Invs., LLC, FirstSun Cap. Bancorp,* 2020 WL 1480857, at *6 (Del. Ch. Mar. 30, 2020).

[18] *Eliason*, 733 A.2d at 946.

[19] Dkt. 90 ("Activision Defs.' Opening Br.") at 26–27.

[20] 8 *Del. C.* § 251(b) (emphasis added).

8

*shall state*," listing six categories.[21] The third sentence provides that "[t]he agreement *so adopted shall be executed* by an authorized person."[22] Each of these three sentences uses mandatory language ("shall").[23] Piecing it together, Plaintiff advances that the agreement approved by the board must contain the listed items and be executed by an authorized person. Put differently, the board must approve the execution version of the merger agreement.

There is not a lot of case law informing Plaintiff's interpretation of Section 251(b). Only a handful of decisions have interpreted the provision, and none address the issue directly.[24]

Plaintiff's execution-version interpretation, however, finds support in the DGCL's statutory scheme. Mergers have a unique status within the DGCL. Although the DGCL is a broad enabling statute, it contains mandatory terms,[25] and Section

---

[21] *Id.* (emphasis added).

[22] *Id.* (emphasis added).

[23] *Id.*

[24] *See Mehta v. Mobile Posse, Inc.*, 2019 WL 2025231, at *10–11 (Del. Ch. May 8, 2019) (denying a motion to dismiss where the merger agreement did not comply with Section 251(b)(5) because the agreement did not identify the consideration for preferred stock); *Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *4 (Del. Ch. Nov. 27, 2001) (invalidating a merger where the defendants failed to actually approve the merger); *Jackson v. Turnbull*, 1994 WL 174668, at *4 (Del. Ch. Feb. 8, 1994) (invalidating a merger where Section 251(b)(5) was not satisfied because "the merger agreement [did] not specify the amount of cash the stockholders [were to] receive," although it set a floor price subject to adjustment based on an investment banker's analysis).

[25] *Manti Hldgs., LLC v. Authentix Acq. Co. Inc.*, 261 A.3d 1199, 1217 (Del. 2021).

251 governing mergers is mandatory.[26]  A board of a Delaware corporation enjoys broad discretion to delegate its powers under the DGCL, but a board may not delegate the power to approve a merger.[27]  And because "ownership of corporations are matters of great importance and should be settled with clarity,"[28] Delaware courts require "strict compliance" with statutory requirements governing fundamental transactions like mergers.[29]  Boards, therefore, must strictly comply with statutory requirements governing mergers.[30]

---

[26] *Cigna Health and Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1088 (Del. Ch. 2014).

[27] 8 *Del. C.* § 141(c)(1) ("but no such committee shall have the power or authority in reference to . . . adopting an agreement of merger . . ."); *see also Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1142 n.2 (Del. 1989) (stating that a board may not "abdicate" its duties under Section 251(b)).

[28] *Blades v. Wisehart*, 2010 WL 4638603 at *10 (Del. Ch. Nov. 17, 2010).

[29] *Id.* (forward stock split); *see also Starr Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) (stock issuance); *Olson v. EV3, Inc.*, 2011 WL 704409, at *14 (Del. Ch. Feb. 21, 2011) (merger agreement providing for top-up option).

[30] Delaware courts apply this expectation even-handedly.  When stockholders avail themselves of statutory rights in the merger context, Delaware law demands strict compliance with the formalities.  *Berger v. Pubco*, 976 A.2d 132, 144 (Del. 2009) (section 262 appraisal rights); *Espinoza v. Zuckerberg*, 124 A.3d 47, 57 (Del. Ch. 2015) (section 228 written consent); *Jackson*, 1994 WL 174668, at *6 (section 262 appraisal rights).

The agreement of merger is "an essential ingredient."[31] Indeed, it is "*the quintessential requirement of a merger under Section 251.*"[32] Section 251(a) only authorizes two or more Delaware corporations to merge "pursuant to an agreement of merger . . . complying and approved in accordance with this section."[33] "Pursuant to" is a restrictive phrase meaning in compliance or conformity with.[34] "Comply[ing]" means doing what is required.[35] "In accordance with" means in a way that agrees with or follows or is in conformity with a rule.[36] Consequently, a valid merger can only be accomplished if the agreement of merger conforms to the requirements of Section 251 and is approved in the way Section 251 requires. And the language of Section 251(b) places special significance on the *agreement* of merger. It expressly provides that "the board . . . shall adopt a resolution approving *an agreement of*

---

[31] 1 R. F. Balotti & J. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 9.9 (4th ed. 2021) ("The first step in any merger is the negotiation of an agreement on the terms and conditions of the merger between the parties. The terms and conditions of the understanding are reduced to writing in the form of an agreement of merger. An agreement of merger is an essential ingredient of any merger except a short form merger.").

[32] 1 D. Drexler, L. Black & A.G. Sparks III, *Delaware Corporation Law and Practice* § 35.04 (emphasis added).

[33] 8 *Del. C.* § 251(a); II R. Saunders, J. Voss & C. Gardner, *Folk on the Delaware General Corporation Law* § 251.01 (7th ed. 2022).

[34] *Genuine Parts Co. v. Essendant, Inc.*, 2019 WL 4257160, at *6 (Del. Ch. Sept. 9, 2019); *Samuels Realty, Inc. v. Tecot Distrib.*, 1977 WL 184925, at *1 (Del. Super. Dec. 15, 1977); *Pursuant to*, Black's Law Dictionary (11th ed. 2019).

[35] *Comply*, Black's Law Dictionary (11th ed. 2019).

[36] *Genuine Parts*, 2019 WL 4257160, at *6 n.52 (citation and quotation marks omitted); *Wilm. Tr. Co. v. Morris*, 54 A.2d 851, 853 (Del. Ch. 1947).

11

*merger.*"[37] It does not say that the board can get away with approving the gist of the merger.[38]

Interpreting Section 251(b) to require a board to approve an execution version thus finds support in: the plain language of Section 251(b); the unique status of mergers within the DGCL; the essential role of the agreement of merger within Section 251; a board's nondelegable authority with respect to mergers; and the aura of mandatory provisions and strict adherence that engulfs the statutory scheme.[39]

But the execution-version interpretation does not square with norms of market practice, at least as Defendants describe them.[40] Defendants argue that:

> Given the practical realities of negotiating merger agreements, boards commonly adopt resolutions approving a merger agreement in draft or near-final draft form and declaring its advisability before the agreement has been

---

[37] 8 *Del. C.* § 251(b) (emphasis added).

[38] 1 Balotti, *supra*, § 9.13 ("The express requirements of Section 251 mandate that the boards of directors approve the agreement between the constituent parties. It is not sufficient for the boards of directors to approve the merger in substance without approving the agreement.").

[39] Similarly, a passing reference to "executed and acknowledged merger agreement" in one of the few decisions interpreting Section 251(b) lends some support to Plaintiff's interpretation. *See Tansey*, 2001 WL 1526306, at *4 (invalidating a merger where the defendants failed to comply with "at least three requirements" of the DGCL, including the board-approval requirement of Section 251(b)). *Tansey*, however, did not directly address the issue, perhaps because the court reached the same outcome on an alternative factual basis: invalidating the merger because the board never actually met to approve the merger. *Id.*

[40] At the pleading stage, the court makes no factual finding concerning the norms of market practice.

> finalized, and this is especially true with respect to ancillary documents, including disclosure schedules.[41]

They support this argument with citations to a leading treatise on Delaware corporation law, which explains that disclosure schedules are often negotiated up until a merger agreement is signed and are sometimes delivered after signing.[42] That treatise does not address other missing components of the Draft Merger Agreement.

Defendants warn that adopting an interpretation of Section 251(b) that runs contrary to market practice "would create uncertainty about the validity of mergers' generally" and "would also create . . . 'uncertainty for third parties dealing with Delaware corporations[.]'"[43] Pushing their policy argument further, they argue that

---

[41] Activision Defs.' Opening Br. at 32; *see also id.* at 31 ("Plaintiff's unreasonable interpretation of Section 251 is also contrary to long-standing merger practice and disregards the importance of predictability in transactional law."); *id.* at 3 ("Plaintiff's attempt to shoehorn terms into Section 251 that do not exist, and fundamentally change well-settled practice by transactional attorneys[.]"); Dkt. 115 ("Activision Defs.' Reply Br.") at 21 ("Plaintiff's interpretation ignores . . . the practical realities of transactional practice and would erect unnecessary roadblocks on how boards must negotiate to the detriment of stockholders in fast moving deal situations."); *id.* at 8 ("Plaintiff's rigid interpretation is contrary to transactional practice and would cast a pall of uncertainty over pending and completed mergers.").

[42] Activision Defs.' Opening Br. at 31–32 (citing Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* §§ 10.01, 10.05 (2018 ed.)); *see also Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *53 n.558 (Del. Ch. Oct. 1, 2018) ("Both the Delaware Supreme Court and this court regularly rely on this treatise as an authoritative source on M & A practice." (collecting cases)), *aff'd*, 198 A.3d 724 (Del. 2018) (TABLE); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011) ("Young lawyers are now often pointed to the sections of *Negotiated Acquisitions of Companies, Subsidiaries and Divisions*, by Lou R. Kling and Eileen T. Nugent, which address in even more depth than Freund, just how complex acquisition agreements work.").

[43] Activision Defs.' Reply Br. at 17 (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 537 (Del. 1996)).

the consequences of the execution-version approach would "disserve Delaware's longstanding public policy of encouraging mergers."[44]

Defendants' first point rings true. It is undoubtedly the case that highly experienced transactional attorneys negotiate and finalize disclosure schedules up until the moment a deal closes, if not beyond.[45] They do not pause efforts for board approval. And it is hard to square this reality with Plaintiff's execution-version interpretation of Section 251(b). Perhaps this should not matter for purposes of the court's analysis. As Vice Chancellor Laster persuasively concluded in his recent *Moelis* decision, "the ability to engage in private ordering remains subject to the limitations imposed by the DGCL."[46] Where market practice exceeds the generous bounds of private ordering afforded by the DGCL, then market practice needs to check itself.

But the court need not resolve the tension between the execution-version interpretation and market practice to resolve Defendants' motion to dismiss. The court assumes for the sake of analysis that Defendants are correct, and that Section 251(b) does not require board approval of the execution version of a merger agreement. What then does Section 251(b) mandate?

At bare minimum, Section 251(b) requires a board to approve an essentially complete version of the merger agreement (the "essentially complete

---

[44] *Id.*

[45] Again, the court is not making a factual finding at this stage.

[46] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, --- A.3d ---, 2024 WL 747180, at *7 (Del. Ch. Feb. 23, 2024).

interpretation").[47] This is so because, absent an essentially complete draft, the board-approval requirement of Section 251(b) would make no sense. What good would board approval of a merger agreement serve if the ultimate merger agreement was altered in essential ways? And how could a board declare the advisability of the merger absent a review of essential terms?

Under the essentially complete interpretation, Defendants' market-practice gripe falls away. There is no straight-faced argument that requiring a board to approve an essentially complete version of a merger agreement is commercially unreasonable. That's just the basic exercise of fiduciary duties,[48] not to mention good corporate hygiene.

Nor does Defendants' policy argument work in the face of the essentially complete interpretation. In fact, it is unclear what room there is for a policy analysis on this point. To again quote *Moelis*: "When the General Assembly has enacted a

---

[47] *See generally* 1 Drexler, *supra*, § 35.04 ("[T]he agreement of merger must be *essentially complete* in all of its terms when presented to the boards and stockholders of each constituent for their respective considerations." (emphasis added)).

[48] On that point, Defendants urge a lax interpretation of Section 251(b) based footnote 25 in *Smith v. Van Gorkom*, where the Delaware Supreme Court stated that a board need not "read *in haec verba* every contract or legal document which it approves[.]" 488 A.2d 858, 883 n.25 (Del. Ch. 1985). This argument is misguided for a few reasons. For starters, *Van Gorkom* mainly explored the nature of a board's fiduciary obligations in the merger context, quite famously holding that the target's directors breached their duty of care when approving and amending a merger agreement. In footnote 25, the high court sought to reassure directors and practitioners that they did not have to read every word of a merger agreement to fulfill their duty of care. That is different from having access to all of the material terms. Nothing in the *van Gorkom* footnote suggests that Section 251(b) would permit a board to approve an incomplete version of a merger agreement.

statute, that statute embodies Delaware's public policy. A court is not free to disregard it."[49] Here, the statute reflects public policy. The court is not free to disregard it. In all events, there is no reasonable argument that requiring a board to approve and declare the advisability of an essentially complete merger agreement would inject uncertainty into transactional practice or stifle mergers generally. The talented bar of transactional attorneys can surely achieve this requirement without much exertion.

It is reasonably conceivable that the Board failed to satisfy the minimal requirements of Section 251(b) by failing to approve an essentially complete version of the Merger Agreement. Plaintiff alleges that the Draft Merger Agreement omitted the consideration, the Disclosure Letter, the Disclosure Schedules, the Survivor's Charter, and the Dividend Provision. There was a lot of important stuff missing from the Draft Merger Agreement. The consideration was essential. The Disclosure Letter was referenced 45 times in the Merger Agreement, and contained information that was important to the agreement. Section 251(b) specifically calls out the Survivor's Charter in the list of six statutorily mandated items. The Dividend Provision was a "key open" issue. Perhaps the Disclosure Schedules were not essential, as Defendants argue. Reasonable minds could reach different conclusions on this point. The court

---

[49] *Moelis*, 2024 WL 747180, at *53 & n.336 (citation omitted); *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 651 (Del. Ch. 2022) ("[P]ublic policy may be determined from consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration." (quoting *Sann v. Renal Care Ctrs. Corp.*, 1995 WL 161458, at *5 (Del. Super. Mar. 28, 1995))), *aff'd in part, rev'd in part on other grounds*, 304 A.3d 896 (Del. 2023).

need not drill down that deep at the pleading stage. Wherever the line in this context is drawn, the Draft Merger Agreement inferably crossed it.

Defendants' motion to dismiss Plaintiff's Section 251(b) claim is denied.

## B. Section 251(c)

Plaintiff alleges that Defendants violated Section 251(c), which requires that a notice of the stockholder meeting set for the purpose of acting on a merger agreement contain either "the agreement required by [Section 251(b)]" (option one) or "a brief summary thereof" (option two).[50]  Plaintiff claims that the notice contained neither the Merger Agreement required by Section 251(b) (failing option one) nor a brief summary of that agreement (failing option two).  Defendants respond that they satisfied both.[51]

Of the two options permitted by Section 251(c), Defendants chose option one. The notice identifies the following as an "Item of Business":

> To consider and vote on the proposal to adopt the Agreement and Plan of Merger (as it may be amended from time to time), dated as of January 18, 2022, which we refer to as the "merger agreement," . . . *a copy of which is attached as Annex A to the proxy statement accompanying this notice* . . . .[52]

The notice, therefore, purports to provide "a copy of the agreement." The notice does not purport to provide a summary of the Merger Agreement.

---

[50] 8 *Del. C.* § 251(c).

[51] Activision Defs.' Opening Br. at 38.

[52] Dkt. 87, Ex. L, Proxy Statement of Notice of Special Meeting of Stockholder to be Held on April 28, 2022 ¶ 1 (emphasis added).

Annex A, however, does not satisfy option one because it does not contain "the agreement required by [Section 251(b)]."[53]  Rather, Annex A omits at least one item mandated by Section 251(b)—the Survivor's Charter.[54]

Defendants say that this is of no moment because they also accomplished option two through the Proxy Statement.  But this does not work.  The Proxy Statement does contain a brief summary of the Merger Agreement, but Section 251(c) requires that the *notice* contain the brief summary. The Proxy Statement is not the notice.[55]

---

[53] 8 *Del. C.* § 251(c).

[54] *Compare* 8 *Del. C.* § 251(b)(4) (providing that the "certificate of incorporation of the resulting corporation shall be as is set forth in an attachment to the agreement"), *with* Dkt. 87, Ex. L at Annex A (showing that the Merger Agreement attached to the Proxy Statement omitted the Survivor's Charter).

[55] Section 251 could be amended to allow a corporation to include the "brief summary" in the proxy statement.  Section 251(c) was amended in 1987 "to require the board of directors to submit to stockholders an agreement of merger or consolidation or brief summary thereof with the notice of the stockholders meeting to vote on the merger." II Saunders, *supra*, § 251.05[G].  The purpose of that amendment was to conform the notice requirements of Section 251(c) to the notice requirements of Section 242, which governs amendments to certificates of incorporation.  2 R. F. Balotti & J. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 242 (2023-2 Supp.), Comment to Chapter 136, Laws of 1987 (providing that "Section 251(c) and 255(c) have been amended to require the board of directors to submit to stockholders an agreement of merger or consolidation or a brief summary thereof with the notice of stockholders meeting to vote on the merger, as is presently required under Section 242 for an amendment to a certificate of incorporation"); II Saunders, *supra*, § 251.05[G].  At the time, Section 242 required only that "[t]he notice shall set forth such amendment in full or a brief summary of the changes to be effected thereby[.]" 2 Balotti, *supra*, § 242, Chapter 327, Laws of 2014.  Section 242, however, was later amended in 2014 to "eliminate the requirement that the notice of a meeting at which an amendment is to be voted on contain a copy of the amendment itself or a brief summary thereof, but only when notice constitutes a notice of internet availability of proxy materials for Securities Exchange Act purposes."  2 Balotti, *supra*, § 242,

It is reasonable to infer that the defendants did not satisfy either option one or option two. Defendants' motion to dismiss Plaintiff's claim under Section 251(c) is denied.[56]

## C.    Section 251(d)

Plaintiff contends that Defendants violated Section 251(d), which prohibits any amendment of any term or condition of the agreement if that alteration or change has an adverse effect on a class of stockholders, by agreeing to extend the termination date in the Merger Agreement without stockholder approval.[57]

Plaintiff asserted a claim in January 2023 that Defendants violated Section 251(d) based on conjecture that the Board had determined to amend the Merger Agreement to extend the termination date beyond July 18, 2023. Plaintiff further claimed that such an extension required a stockholder vote under Section 251(d) because it would adversely affect stockholders since the closing "will be substantially

---

Chapter 327, Laws of 2014, Synopsis of Section 242; *see also* 17 C.F.R. § 240.14a-16 ("The Notice of Internet Availability of Proxy Materials may not be incorporated into, or combined with, another document, except that it may be incorporated into, or combined with, a notice of security holder meeting required under state law, unless state law prohibits such incorporation or combination."). The same is true for action by written consent under Section 228. *See* 8 *Del. C.* § 228; 2023 Del. Laws Ch. 98 (S.B.114) (amending Section 228 to include the following language: "The notice required by this subsection may be provided by a notice which constitutes a notice of internet availability of proxy materials under rules promulgated under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq."). No similar amendment has ever been made to Section 251. As it stands, therefore, a board can omit the brief summary in favor of internet-available proxy materials for purposes of Sections 228 and 242, but not Section 251.

[56] The Section 251(c)(7) claim is addressed in a separate letter decision.

[57] *8 Del. C.* § 251(d).

19

delayed," and it will "prevent the payments of dividends—plainly an adverse effect."[58] Plaintiff's allegations as of January 2023, however, were not reasonably conceivable because Plaintiff alleged no facts to support the assertion that Defendants actually agreed to extend the outside termination date.

After Plaintiff filed the Amended Complaint, however, Defendants did agree to extend the outside termination date. The Letter Agreement waived enforcement of the termination date for three months, until October 18, 2023, authorized the Company to declare a cash dividend of $0.99 per share on July 18, 2023, and increased the termination fee.

Plaintiff could have amended its pleading to challenge the Letter Agreement but did not do so.[59] Plaintiff cannot amend its pleadings through briefing.

Plaintiff's claim under Section 251(d) is dismissed.

### D. Section 141

Plaintiff argues that the Board violated Section 141(c) by delegating negotiations over the Dividend Provision to an *ad hoc* Board committee. Section 141(c)(2) requires that no board "shall have the power or authority in reference to . . . (i) approving or adopting, or recommending to the stockholders, any action or matter . . . expressly required by this chapter to be submitted to stockholders for approval."[60]

---

[58] Am. Compl. ¶¶ 353, 356.

[59] *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 172 (Del. 2006) ("How is the integrity of the judicial process enhanced by proceeding with a complaint that is misleading" when plaintiff is "aware of the salient facts[?]" (internal citations omitted)).

[60] 8 *Del. C.* § 141(c)(2).

Section 251(b) imposes a statutory duty on the Board to approve the terms of an agreement of merger.[61] Where a board has a specific statutory duty, it may not delegate that duty to a committee unless Section 141(c) permits it to do so.[62] Under Section 141(c)(2), "a committee does not have any power with respect to" approving an agreement of merger or its terms.[63] For instance, a board cannot delegate the determination of the merger consideration to a committee.[64]

The Dividend Provision was a term of the merger. It is reasonably conceivable that the Board delegated negotiation of that provision to an *ad hoc* committee. It is also reasonably conceivable that the committee alone, and not the Board, approved the Dividend Provision, which did not appear in the Draft Merger Agreement. Plaintiff has therefore adequately alleged that the Board violated Section 141(c) by delegating to a committee approval of the Dividend Provision.[65]

### E. Conversion

Plaintiff claims unlawful conversion based on the statutory violations. "A claim of conversion requires that, at the time of the alleged conversion: (a) plaintiff held a property interest in the stock; (b) plaintiff had a right to possession of the stock;

---

[61] 8 *Del. C.* § 251(b); *van Gorkom*, 488 A.2d at 873.

[62] 1 Balotti, *supra*, § 4.10[A]; *Jackson*, 1994 WL 174668, at *4 ("where the statute imposes the duty on the directors to deal with a particular subject matter" the duty cannot be delegated).

[63] I R. Saunders, J. Voss & C. Gardner, *Folk on the Delaware General Corporation Law* § 141.03 (7th ed. 2022).

[64] *Jackson*, 1994 WL 174668, at *4 ("8 *Del. C.* § 141(c) . . . does not allow the board to delegate its responsibilities . . . to a committee of board members").

[65] Dkt. 99 at 34–35.

and (c) the defendant converted plaintiff's stock."[66]  Conversion is an "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it."[67]  A stockholder's shares are converted by "any act of control or dominion . . . without the [stockholder's] authority or consent, and in disregard, violation, or denial of his rights as a stockholder of the company."[68]

Through the merger, Plaintiff's shares were converted into the right to receive the merger consideration. Although the merger statute uses the term "conversion" in a different sense than a claim for conversion, the word choice is striking.[69]  Through the merger, Defendants took Plaintiff's shares and replaced them with something else, in disregard of his rights as a stockholder under Section 251. Conversion by merger satisfies the tort of conversion.[70]  Plaintiff has adequately alleged that the merger was invalid under Section 251, and so has pled a conversion claim.

---

[66] *Arnold*, 678 A.2d at 536 (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93–94 (Del. 1933)).

[67] *Drug, Inc.*, 168 A. at 93.

[68] *Id.* (quoting *Layman v. F.F. Slocomb & Co.*, 76 A. 1094, 1095 (Del. 1909)).

[69] *See* 8 *Del. C.* § 251(b)(5) (requiring that the merger agreement state "[t]he manner if any, of converting the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation, or of cancelling some or all of such shares, and, if any shares of any of the constituent corporations are not to remain outstanding, to be converted solely into shares or other securities of the surviving or resulting corporation or to be cancelled, the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange for, or upon conversion of such shares and the surrender of any certificates evidencing them, which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation").

[70] *Arnold*, 687 A.2d at 536 (stating that, to establish conversion, "[a] plaintiff must show that the merger did not effectively exchange his . . . shares . . . [for the merger

22

Defendant's motion to dismiss Plaintiff's conversion claim is denied.

## III.   CONCLUSION

Plaintiff's claim under Section 251(d) is dismissed without leave to replead, as called for by Court of Chancery Rule 15(aaa).  The remainder of the motion is denied. Delaware law requires compliance with Section 251 for a merger to be valid.[71] Delaware law offers solutions for missteps.[72]  The parties are ordered to meet and confer on a path forward.

consideration]"); *Tansey*, 2001 WL 1526306 at *7 (noting that "invalid First Merger resulted in a conversion of Tansey's TSNN shares" and "the First Merger worked a conversion because the defendants failed to take the specific steps explicitly required under the merger statutes").

[71] *Tansey*, 2001 WL 1526306, at *4, 7 (finding merger "invalid because it was not preceded by an accomplishment of the statutorily required acts in the correct sequence").

[72] *See* 8 *Del. C.* §§ 204, 205.