# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOUGLAS M. CHERTOK and SDTC ADVISORS LLC, a New York limited liability company, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0417-PAF |
| ONSOLVE, LLC, a Delaware limited liability company (fka EMERGENCY COMMUNICATIONS NETWORK, LLC; successor to SWN COMMUNICATIONS, INC., a Delaware corporation), | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: June 9, 2025
Date Decided: April 13, 2026
Date Corrected: April 21, 2026

Kelly A. Green, Jason Z. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Douglas Chertok, Fort Lauderdale, Florida; *Attorneys for Plaintiffs Douglas M. Chertok and SDTC Advisors LLC*

Paul J. Lockwood, Lauren N. Rosenello, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Defendant OnSolve, LLC*

**FIORAVANTI, Vice Chancellor**

A corporation conditioned payment of merger consideration on stockholders executing and returning a number of documents, including one containing a release of claims. A common stockholder who had chosen not to comply later sued the corporation, asserting claims for breach of the certificate of incorporation and for unjust enrichment. The corporation withdrew the conditions after the stockholder filed suit, but contended that it was not required to pay prejudgment interest. The stockholder, on the other hand, maintained that he was not only entitled to interest, but also to damages exceeding the per share consideration provided for in the merger agreement.

In this post-trial opinion, the court concludes that the corporation breached the certificate of incorporation by conditioning payment of the merger consideration on the execution of a release agreement. The stockholder's damages are no greater than his share of the merger consideration as calculated under the terms of the merger agreement. Having prevailed on his breach of contract claim, the stockholder is entitled to prejudgment interest as a matter of right. In the exercise of the court's discretion, interest will be calculated at the legal rate in effect when payment became due and will not be compounded.

## I. BACKGROUND

These are the facts as the court finds them after trial.[1]

### A. Factual Background

#### 1. The Parties and the Company's capital structure

SDTC Advisors LLC ("SDTC") is a New York limited liability company.[2]

Douglas Chertok (together with SDTC, the "Plaintiffs") is the founder, managing member, and 50% owner of SDTC.[3] The other 50% owner was Tony Schmitz, who is not a party to this action.[4]

SWN Communications Inc. ("SWN" or the "Company") is a Delaware corporation.[5] Schmitz was also SWN's chief executive officer.[6] Prior to the merger giving rise to this action, the Company's Certificate of Incorporation (the

---

[1] Other factual findings are contained in the analysis of the claims. Trial exhibits are cited as "JX," and references to the docket are cited as "Dkt.," with each followed by the docket number and the relevant section, page, paragraph, or exhibit. The Amended Complaint in this action (Dkt. 76) will be cited as "Am. Compl." Citations to the trial transcript (Dkt. 78) are in the form "Tr." Citations to the transcript of post-trial oral argument (Dkt. 99) are in the form of "Post-Trial Arg." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2] JX 1 (hereinafter "Warrant") at 6; JX 2; JX 3; Tr. 6:10−14, 8:9−11.

[3] Chertok is an attorney, admitted to practice law in New York. He was admitted *pro hac vice* in this case and presented Plaintiffs' case at trial.

[4] Am. Compl. ¶¶ 13–14; JX 16 at 5 n.2 ("Schmitz and Chertok each directly owned 50 percent of the membership interests of SDTC"). The limited liability company agreement of SDTC is not in the record.

[5] JX 6 at 1 (hereinafter "Certificate"); Warrant at 1, 6; Tr. 6:15−16.

[6] *See* JX 7 (hereinafter "Merger Agreement") § 13.2(b).

2

"Certificate")[7] authorized two classes of stock: Common Stock and Preferred Stock.[8] Holders of Common Stock were entitled to receive dividends when and if declared by the board of directors (the "Board").[9] Upon a "Liquidation Event," which included a merger,[10] SWN was required to satisfy the liquidation preferences of the Preferred Stock and "pay[] or provi[de] for payment of the debts or other liabilities of the C[ompany]."[11] Any remaining assets were then to be distributed to the holders of Common Stock on a pro rata basis.[12]

## 2. The Warrant

In July 2006, SDTC received a warrant to purchase SWN Common Stock in exchange for services that it provided to the Company (the "Warrant").[13] The Warrant entitled SDTC to purchase up to 400,000 shares of SWN Common Stock at an exercise price of $0.01 per share.[14] Under Section 2(a) of the Warrant, the holder

---

[7] *See* Certificate at 1. The Company's original certificate of incorporation is dated November 21, 2001. *Id.*

[8] *Id.* Art. IV § 4.01.

[9] *Id.* Art. IV § 4.03(c).

[10] *Id.* Art. IV § 4.03(e). To be precise, a Liquidation Event is defined to include a "Sale of the Corporation," which, in turn, is defined to include a "merger or consolidation" of the Company into another entity. *Id.*

[11] *Id.* Art. IV § 4.03(d).

[12] *Id.*

[13] Warrant at 1; Am. Compl. ¶ 11; Tr. 8:18−20.

[14] Warrant at 1; Tr. 8:20−21.

could exercise the Warrant by delivering a duly completed exercise form and the exercise price.[15]

The Warrant permitted the holder to acquire the shares through a "cashless exercise" if, at the time of exercise, the fair market value of a share of Common Stock exceeded the $0.01 exercise price.[16] In that circumstance, the holder could surrender all or part of the Warrant in exchange for a net number of shares determined by a formula that accounted for the difference between the fair market value and the exercise price.[17] In connection with a cashless exercise, the Company was required to provide the holder with a written notice disclosing the fair market value of the Common Stock, as determined in good faith by the Board or a duly appointed Board committee.[18]

Upon a partial exercise, SWN was required to issue to the holder a new warrant reflecting the remaining number of shares that may be acquired under the Warrant.[19]

---

[15] Warrant § 2(a).

[16] *Id.* § 2(b).

[17] *Id.*

[18] *Id.*

[19] *Id.* § 2(c).

### a. The First Exercise Notice

In June 2007, Chertok and Schmitz elected to dissolve SDTC and to assign the Warrant to themselves in their individual capacities, with each receiving a warrant exercisable for up to 200,000 shares of SWN Common Stock.[20] On June 28, Schmitz executed and delivered to SWN a notice of transfer on behalf of SDTC's members to divide the Warrant and to assign and transfer to Chertok and Schmitz warrants for 200,000 shares each (the "Transfer Notice").[21] Although Chertok had previously agreed to this arrangement, he did not sign the Transfer Notice and claims not to have known at the time that Schmitz had executed and submitted a transfer notice to SWN.[22]

Almost two years later, on March 23, 2009, Chertok delivered a notice to SWN purporting to exercise the Warrant on behalf of SDTC for 100 shares of SWN Common Stock at the aggregate exercise price of $1.00 ("First Exercise Notice").[23] The notice enclosed a check for $1.00 and requested that SWN issue a stock certificate for 100 shares and deliver a certificate of adjustment together with a new warrant reflecting the remaining right to acquire shares.[24]

---

[20] Am. Compl. ¶¶ 13–14; JX 3 at 1. The record does not reveal whether SDTC or its members took any further action to effect its dissolution.

[21] JX 3 at 1, 4.

[22] Am. Compl. ¶ 14.

[23] JX 2 at 1; Tr. 6:17−19.

[24] JX 2 at 1.

On April 30, 2009, SWN acknowledged receipt of Chertok's First Exercise Notice (the "April 30 Letter").[25] The April 30 Letter informed Chertok that the Warrant had previously been assigned and divided in accordance with Schmitz's Transfer Notice, a copy of which SWN attached to its April 30 Letter.[26] SWN enclosed an updated warrant exercise form reflecting Chertok's right to acquire 200,000 shares of Common Stock and asked that he sign and return the form to complete the 100-share exercise that he had initiated on March 23.[27] Chertok did not sign or return the updated form at that time, and SWN did not issue a new warrant reflecting a partial exercise.[28]

### b. The Second Exercise Notice

On December 30, 2011, more than two-and-a-half years after receiving the Company's April 30 Letter, Chertok executed the warrant exercise form for 100 shares of SWN Common Stock. Chertok also requested on behalf of himself and SDTC to execute a cashless exercise of the balance of shares available under his

---

[25] JX 3.

[26] *Id.* at 1, 4.

[27] *Id.* at 3; Am. Compl. ¶ 13.

[28] Am. Compl. ¶ 14.

6

warrant (the "Second Exercise Notice").[29]  On April 23, 2012, SWN issued to Chertok a stock certificate in his name for 188,894 shares of Common Stock.[30]

### 3.    The Merger

On May 5, 2017, SWN agreed to be acquired by OnSolve, LLC ("OnSolve" or the "Defendant," formerly known as Emergency Communications Network, LLC)[31] for total cash consideration of $250 million (the "Merger").  The terms of the transaction were memorialized in an Agreement and Plan of Merger (the "Merger Agreement") among SWN, OnSolve, and its affiliate, SWN Merger Sub, Inc. ("Merger Sub").[32]

#### a.    The Merger Agreement and the Joinder Agreement

Under the Merger Agreement, the Merger consideration payable to stockholders would consist of both a closing payment and contingent post-closing payments.  At closing, SWN's stockholders were entitled to a cash payment of $250 million, subject to an estimated net working capital adjustment amount and

---

[29] *See* JX 12 at 2; Tr. 6:17−19.

[30] JX 5; Tr. 5:20−24, 6:19−20.  The parties dispute whether the 188,894 shares reflected in the April 23, 2012, stock certificate reflected all of the shares to which Chertok was entitled under the Warrant.  As explained below, OnSolve has agreed not to contest Chertok's assertion that he owns 188,994 shares for purposes of calculating any amounts due in this action.

[31] Tr. 8:15−16.

[32] Merger Agreement at 1; Tr. 9:20−22.  Both OnSolve and Merger Sub are Delaware entities.  The transaction contemplated that Merger Sub would merge with and into SWN, with SWN surviving as a wholly owned subsidiary of OnSolve's parent.  Merger Agreement § 2.1; Tr. 8:19−22.

reduced by estimated closing-date funded debt, estimated acquisition expenses, an escrow amount, and a holder representative expense amount.[33]

The Merger Agreement defined acquisition expenses to include change-of-control bonus payments to management and other employees totaling approximately $16 million.[34] The escrows totaled $4.5 million (the "Escrow Amounts").[35] Specifically, $1 million was allocated to an "Adjustment Escrow," $2.5 million to an "Indemnity Escrow," and $1 million was set aside as a "Holder Representative Expense Amount" to fund the fees and expenses of the stockholder representative.[36]

The Merger Agreement expressly provided that OnSolve "shall not pay any amounts" of the Merger consideration to eligible SWN stockholders "unless and until" they delivered: (1) their stock certificates, (2) an executed Joinder, Indemnification and Release Agreement (the "Joinder Agreement"), (3) a letter of transmittal, and (4) an Internal Revenue Service ("IRS") Form W-9 (together the "Required Deliveries").[37]

---

[33] Merger Agreement § 3.1(d).

[34] The Merger Agreement states that the bonuses are reflected in Schedule 4.27(a), but that schedule is not in the record. *See* Merger Agreement § 1.1. As explained below, an information statement sent to stockholders indicated that the bonuses were estimated to be $16 million. A spreadsheet reflecting SWN's final release amounts lists final bonuses of $15,711,908.78. JX 39, Table "Payout Spreadsheet (Merger)," Cell AY238; Tr. 68:7−11. There were also additional costs associated with these bonuses. *Id.* at 68:11−14; JX 22.

[35] Tr. 72:19−20.

[36] Merger Agreement § 3.1; Tr. 71:10−72:17.

[37] Merger Agreement § 3.2(b).

The Joinder Agreement was an annex to the Merger Agreement.[38] It is a thirteen-page document. Among its more notable terms are: (i) a waiver of appraisal rights, (ii) a covenant not to transfer SWN shares between the date of execution and the effective date of the Merger, and (iii) a broad, general release of all claims the stockholder may have had against SWN, OnSolve, or Merger Sub "from the beginning of time" through effective date of the Merger.[39] The release carves out claims arising under the Merger Agreement or the transactions contemplated thereby, as well as claims for compensation, bonuses, or employment benefits that accrued prior to the effective date of the Merger.[40]

The Merger Agreement obligated SWN to take all necessary actions to obtain stockholder approval of the Merger through written consent.[41] Upon obtaining stockholder approval of the Merger, SWN was required to disseminate to non-consenting stockholders an information statement describing the Merger and related transactions.[42] The information statement had to include a notice explaining the

---

[38] *See id.* at vi; JX 8 (hereinafter "Joinder Agreement").

[39] *Id.* §§ 1–2, 7(a).

[40] *Id.* § 7(a)(a)–(b).

[41] Merger Agreement § 8.3(a).

[42] *Id.* § 8.3(b).

right of non-consenting stockholders to seek appraisal under the Delaware General Corporation Law ("DGCL").[43]

### b. The Information Statement

On May 9, 2017, SWN emailed Chertok a notice containing the information required under the Merger Agreement (the "Information Statement").[44] The Information Statement notified Chertok that stockholders holding the requisite number of shares of SWN's outstanding stock had approved the Merger by written consent.[45] The email attached copies of the fully executed Merger Agreement, the stockholder written consents, Section 262 of the DGCL, and certain financial information. It also attached a spreadsheet indicating that Chertok owned 188,894 shares of Common Stock, although Chertok later disputed that figure and contended that he was entitled to 100 additional shares.

The Information Statement disclosed that each outstanding share of SWN Common Stock would be entitled to receive approximately $2.22 in Merger consideration, plus potential additional payments.[46] It explained that Chertok and other non-consenting stockholders could receive additional payments if any portion

---

[43] *Id.*

[44] JX 10 (hereinafter "Information Statement").

[45] *Id.*; JX 11 at 1−2.

[46] Information Statement at 2.

of the escrowed amounts were released after closing.[47] The Information Statement also stated that any common stockholder wishing to receive the Merger consideration was required to deliver to the exchange agent an executed Joinder Agreement, along with the other Required Deliveries.[48]

### c. Chertok's appraisal demand and the Merger's closing

On May 23, 2017, Chertok responded to SWN's May 9 email, asserting that he owned at least 100 more shares of Common Stock than the 188,894 reflected in SWN's records.[49] On May 27, Chertok sent a notice to SWN on behalf of himself and SDTC demanding appraisal for 188,994 shares of Common Stock.[50]

The Merger closed on June 1, 2017.[51] On June 8, SWN acknowledged receipt of Chertok and SDTC's appraisal demand and notified SDTC that the Merger had closed.[52] On July 29, Chertok and SDTC withdrew their appraisal demand.[53] On August 9, the Company acknowledged that withdrawal. Following the withdrawal of the appraisal demand, SWN did not deliver any Merger consideration to Chertok or SDTC, and Chertok never provided the exchange agent with any of the Required

---

[47] Information Statement at 2–3; Tr. 11:6−10; JX 12 at 2.

[48] Merger Agreement § 1.1; Information Statement at 2.

[49] JX 11 at 1.

[50] Tr. 6:1−2, 15:16−18; JX 15 at 6.

[51] JX 12 at 2; Tr. 5:24−6:1, 7:2−4, 8:15−16, 58:10−12.

[52] Tr. 15:19−21.

[53] *Id.* at 15:22−24.

11

Deliveries that were prerequisites to the receipt of the Merger consideration.[54]  A year later, in June 2018, $3,919,864 of the Escrow Amounts were released for distribution to SWN stockholders.[55]

After nearly three years of silence following the closing, Chertok sent SWN a three-page letter on May 5, 2020.[56]  The letter asserted that he and SDTC were owed Merger consideration and unpaid dividends on 188,994 shares of Common Stock, along with interest accrued from October 1, 2017, which was the deadline to file an appraisal action.[57]  The letter also objected to OnSolve's demand that Chertok and SDTC execute and deliver the Required Deliveries, including the Joinder Agreement, which Chertok contended was improper under Delaware law.  The letter demanded payment within three days.[58]

Before receiving a formal response from the Company, Chertok and SDTC filed their complaint ("Complaint") in this action on May 29, 2020.[59]  On June 1, counsel for OnSolve sent a letter to Chertok and SDTC's counsel, responding to the May 5 letter.[60]  The response stated that SWN's records reflected that Chertok

---

[54] *See* JX 12 at 3; Tr. 15:24−16:1.

[55] JX 41 at 4–5; Tr. 73:13−21, 91:8−16.

[56] JX 12.

[57] *Id.* at 1, 3; Tr. 6:8−9, 7:4−5.

[58] JX 12 at 3.

[59] Dkt. 1; Tr. 7:6−11.

[60] JX 14.

owned 188,894 shares of Common Stock at the time of the Merger, which included the 100 shares that Chertok had acquired through the First Exercise Notice.[61] Although the letter did not mention the Complaint, it stated that "SWN has not disputed [Chertok's] right to the merger consideration," but insisted that SWN "will not pay interest."[62] The letter did not address Chertok and SDTC's demand for dividends or respond to Chertok's objection to the Required Deliveries. Instead, it simply enclosed a check for $491,076.06, representing what SWN believed to be Chertok's share of the Merger consideration, and an IRS Form W-9, which Chertok was asked to fill out and return.[63]

On June 5, Chertok replied directly in a ten-page letter returning the check.[64] In his response, Chertok complained that OnSolve had not addressed his objections concerning the share count and the calculation of the amounts due, and that the amount tendered did not fully satisfy OnSolve's obligation.[65]

---

[61] *Id.* at 1–2.

[62] *Id.*

[63] *Id.* at 2–4.

[64] JX 12 at 4–12.

[65] *Id.* at 5.

## B.  Procedural History

Plaintiffs' Complaint asserted two counts.[66]  Count I asserted a claim for breach of contract, alleging that OnSolve breached the Certificate.[67]  Count II, pleaded in the alternative, asserted a claim for unjust enrichment.[68]

On July 1, 2020, Defendant moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).[69]  On April 29, 2021, the court issued an order partially granting and partially denying the motion to dismiss.[70]  The court dismissed both counts to the extent they were premised on the non-payment of dividends, but denied the motion in all other respects.[71]

The court held a one-day trial on a paper record.[72]  In the lead-up to trial, the parties tried to resolve, or at least narrow, their differences over the number of shares that Chertok owned and the amount of Merger consideration to which those shares were entitled under the Merger Agreement.  During those discussions, for purposes of this action, OnSolve chose not to dispute Chertok's claim that any amounts due should be calculated based on ownership of 188,994 shares rather than the 188,894

---

[66] Dkt. 1.

[67] *Id.* ¶¶ 47−59.

[68] *Id.* ¶¶ 60−65.

[69] Dkt. 4.

[70] Dkt. 18 (hereinafter "Order Resolving Motion to Dismiss") ¶ 20.

[71] *Id.*

[72] Dkts. 77−78.

shares reflected in SWN's stock certificate and records. OnSolve also acknowledged that Chertok was entitled to a cash distribution of $29,044.83 and a portion of the refunded escrows in the amount of $7,237.36.[73] One day after trial, Plaintiffs filed an amended complaint (the "Amended Complaint") to conform to the evidence, which included allegations that OnSolve acknowledged Chertok's entitlement to a cash distribution of $29,044.83.[74]

## II.    ANALYSIS

### A.    Breach of Contract

Plaintiffs' breach of contract claim is grounded in Defendant's alleged breach of the SWN Certificate. The Delaware Supreme Court has held that a corporation's certificate of incorporation is a "contract[] among a corporation's shareholders." *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010); *see Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *5 (Del. Ch. Oct. 20, 2014) ("The certificate of incorporation is a contract between a Delaware corporation and its stockholders." (citation modified)). "Stockholders, therefore, may bring direct actions in contract against their corporation based on breach of the charter." *Lacey ex rel. S. Copper Corp. v. Mota-Velasco,* 2021 WL 508982, at *7 (Del. Ch. Feb. 11, 2021) (footnote omitted). To prevail on their breach of contract claim, Plaintiffs

---

[73] JX 38; JX 39; JX 40.

[74] Dkt. 76.

must establish by a preponderance of the evidence: "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citation omitted).

SDTC lacks standing to assert a breach of contract claim because Plaintiffs have failed to establish that SDTC was a stockholder of SWN at the time of the Merger. Although SDTC originally held the Warrant to purchase up to 400,000 shares of SWN Common Stock, the Warrant was assigned and divided between Schmitz and Chertok in 2007. When Chertok attempted to exercise the Warrant to purchase 100 shares in 2009, the Company informed him that SDTC no longer had any interest in the Warrant and that he personally held a warrant to purchase up to 200,000 shares of Common Stock.[75] SDTC never contested that transfer. In late December 2011, Chertok sent the Second Exercise Notice for 100 shares of SWN

---

[75] JX 2; JX 3.

Common Stock and, at the same time, requested a cashless exercise of the balance of the Warrant (*i.e.*, for 199,900 shares of SWN Common Stock).[76] In April 2012, the Company issued a stock certificate in Chertok's name for 188,894 shares of Common Stock. The parties dispute whether that certificate reflected all of the shares to which Chertok was entitled under the Warrant, but there is no dispute that any additional shares associated with the Warrant would belong, if at all, to Chertok, not SDTC. Indeed, when Chertok later raised this issue with SWN after receiving the Information Statement, he claimed the additional shares as his own.[77] Because SDTC was not a stockholder at the time of the Merger, it has no standing to assert a claim for breach of the Certificate under a breach-of-contract theory. Only Chertok does.

### 1. The breach of the Certificate

Chertok's breach of contract theory is based entirely upon this court's decision in *Mehta*.[78] In *Mehta*, two stockholders of Smurfit-Stone Container Corporation made a timely appraisal demand in response to a merger between Smurfit-Stone and Rock Tenn Company, but did not initiate an appraisal proceeding within the 120-

---

[76] Am. Compl. ¶ 15.

[77] *See* JX 11 ("[Y]our email attachment below indicating *my* beneficial ownership in SWN [as 188,894 shares] is incorrect. While I need to review my records, *my* beneficial ownership is at least 100 shares more than the number on the spreadsheet." (emphasis added)).

[78] Post-Trial Arg. at 6:2–6.

day deadline under Section 262(d) of the DGCL. 2014 WL 5438534, at *2. Several

months later, the stockholders sought to withdraw their appraisal demand and instead

receive the merger consideration, which was a combination of cash and stock. *Id.*

The corporation told the stockholders that, under Section 262, they could withdraw

their appraisal demand only with the corporation's permission, and that the

corporation would only give permission if the stockholders entered into a settlement

agreement with the corporation. *Id.*

The stockholders, proceeding *pro se*, initiated litigation in this court under

several theories, challenging both premerger conduct and claims relating to the

merger. *Id.* The court dismissed claims for fraud and breach of fiduciary duty but

held that the plaintiffs had viable claims concerning the company's refusal to pay

the merger consideration, because the corporation's reading of Section 262 was

incorrect. *Id.* at *3–5. The pertinent part of the opinion on this issue is short and to

the point:

> Understandably given their status as *pro se* litigants, the Mehtas have
> not framed a claim for the merger consideration in traditional legal
> terms, but it can be conceptualized in at least two ways. One way to
> frame the legal theory would be as a breach of contract claim. The
> certificate of incorporation is a "contract between a Delaware
> corporation and its stockholders." *Boilermakers Local 154 Ret. Fund
> v. Chevron Corp.*, 73 A.3d 934, 955 (Del. Ch. 2013) (citing *Airgas, Inc.
> v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010)). "It is
> elementary that [the Delaware General Corporation Law's] provisions
> are written into every corporate charter." *Federal United Corp. v.
> Havender*, 11 A.2d 331, 333 (Del. 1940). The corporate contract
> between the Mehtas and Smurfit–Stone included the provisions of

18

> Section 262, which call for stockholders who demanded appraisal to receive the merger consideration when no appraisal petition is timely filed. Rock–Tenn Sub breached the corporate contract by failing to pay the merger consideration when it came due.

*Id.* at *5.

In denying OnSolve's motion to dismiss this action, the court, relying on *Mehta*'s reasoning, held that Plaintiffs stated a claim for breach of contract.[79] Under Section 262(e) of the DGCL, a stockholder that has demanded appraisal but has not commenced or joined an appraisal proceeding may withdraw the demand within 60 days of the effective date of the merger and accept the terms offered in the merger. 8 *Del. C.* § 262(e). Additionally, as here, if no appraisal petition is filed within 120 days of the merger, "then all appraisal rights lapse," and the stockholders who previously demanded appraisal are entitled to the merger consideration. *Mehta*, 2014 WL 5438534, at *5.

Under Section 262(e) of the DGCL, which is incorporated into the Certificate, OnSolve was obligated to pay the Merger consideration to Chertok after he timely withdrew the appraisal demand. *Id.* (citing *Havender*, 11 A.2d at 338). But OnSolve insisted that a stockholder could not receive the Merger consideration unless the stockholder provided all of the Required Deliveries, including the Joinder

---

[79] Order Resolving Motion to Dismiss ¶ 8.

Agreement.[80]  OnSolve earlier conceded, for purposes of the motion to dismiss, that Plaintiffs were justified in refusing to sign the Joinder Agreement as a condition to receive the Merger consideration, because "that release would lack consideration."[81] The court agreed and held that Plaintiffs had stated a claim for breach of contract by conditioning receipt of the Merger consideration on their returning an executed Joinder Agreement.[82]

At trial, Defendant did not alter its position from the motion to dismiss stage.[83] Rather, OnSolve conceded that it could not compel Chertok to execute the Joinder Agreement as a condition to payment of the Merger consideration.[84]  Accordingly, the court concludes that OnSolve's conditioning payment of the Merger

---

[80] The court does not need to address whether Chertok would have been justified in refusing to supply any of the Required Deliveries because the Company insisted that all of them were necessary before it would pay the Merger consideration.

[81] Dkt. 12 Tr. 7:11–13; *see also* Dkt. 16 at 3 ("Solely for purposes of this motion, OnSolve allows that Plaintiffs could point to [*Cigna Health & Life Insurance Co. v. Audax Health Solutions, Inc.*, 107 A.3d 1082 (Del. Ch. 2014)] to justify their refusal to execute the Joinder Agreement, which contains a release.").  In *Cigna*, the court held that the requirement that a stockholder execute a release of claims in order to receive the merger consideration was unenforceable because it was not included in the merger agreement and was not supported by separate consideration.  *Cigna*, 107 A.3d at 1088−89.

[82] Order Resolving Motion to Dismiss ¶ 8.

[83] Post-Trial Arg. at 22:17–23:1.

[84] Tr. 98:20−22 ("I'm counsel to this Company . . .  I read *Cigna*.  We can't impose a release on the guy."); Post-Trial Arg. at 22:15–16.

consideration upon Chertok's returning an executed Joinder Agreement breached the Certificate.[85]

## 2. Merger consideration, escrow amounts, and distributions

After his timely withdrawal of the appraisal demand, Chertok was entitled to payment of the Merger consideration. 8 *Del. C.* 262(e). Defendant agrees;[86] Chertok does not. Chertok argues that he is entitled to more than the Merger consideration because he is not a party to the Merger Agreement and did not consent to it.[87] Plaintiffs contend that, because Chertok sought appraisal and did not consent to the Merger Agreement, the Certificate governs not only his entitlement to payment but also the amount payable to him.[88] Specifically, Plaintiffs contend that Chertok is entitled to receive his proportionate share of the $250 million in Merger consideration without any deductions for the bonuses to management or the expenses that were the subject of the escrows. Under this theory, Chertok contends

---

[85] Plaintiffs argue that, in the alternative, Defendant was unjustly enriched because it admits that Plaintiffs are entitled to the Merger consideration. Pls.' Opening Br. 13; Tr. 41:14−42:13; Post-Trial Arg. at 7:1. Because the contract claim provides an adequate remedy, the unjust enrichment claim is duplicative and must be dismissed. *See Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009) ("Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."), *aff'd*, 991 A.2d 1120 (Del. 2010).

[86] Post-Trial Arg. at 14:17–18, 15:1–5, 15:9–17.

[87] Pls.' Opening Br. 7−16; Tr. 10:4−10, 11:12−12:2, 16:3−6, 32:5−7, 33:13−34:2, 36:23−37:1, 38:12−17, 45:9−12, 48:22−49:2, 53:18−54:2.

[88] Tr. 15:8−10.

that he is entitled to $555,942.76 from the Merger, plus $29,044.83 in unpaid dividends.[89] OnSolve has acknowledged that Chertok is entitled to a distribution of $29,044.83.[90] But Defendant counters that the amount of Merger consideration owed to Chertok remains governed by the Merger Agreement, as for every other SWN common stockholder.[91] Thus, the central question is whether Chertok is entitled to receive greater per share Merger consideration than other holders of Common Stock. In short, he is not.

Chertok's argument proceeds from a misreading of *Mehta*. Chertok claims that under *Mehta*, a stockholder who does not consent to a merger and otherwise does not pursue appraisal may sue for breach of the certificate and recover damages untethered to the amounts provided for under a merger agreement.[92] *Mehta* did not create this path to damages. The court held that the Mehtas were entitled to damages equating to the value of the merger consideration, which was a combination of cash and stock.[93] Thus, the plaintiffs' damages were the cash portion of the merger

---

[89] *Id.* at 25:16−28:1, 29:7−19; Post-Trial Arg. at 8:6–10. For purposes of calculating the amounts due in this action, the court uses 188,994 shares of SWN Common Stock because OnSolve has elected not to contest Chertok's assertion that the calculation should be based on that figure.

[90] JX 40 at 1; Def.'s Pre-Trial Br. 3, 12.

[91] Def.'s Answering Br. 2.

[92] Post-Trial Arg. at 30:2−5, 30:16−32:23, 34:23−35:20.

[93] The court also held that the plaintiffs were not entitled to consequential damages under either a breach of contract theory or an unjust enrichment theory. *Mehta*, 2014 WL 5438534, at *6.

consideration plus the value of the stock consideration. *Mehta*, 2014 WL 5438534, at *6.[94]

Chertok is not entitled to receive per share Merger consideration that is greater than what is provided for in the Merger Agreement. Under the Merger Agreement, upon closing, the stockholders' shares were "automatically canceled and converted into and become the right . . . to receive in cash (without interest) the applicable portion of [] the Closing Merger Consideration . . .".[95] Section 3.1(e) of the Merger Agreement governed the allocation of the Merger Consideration among holders of Common Stock, Preferred Stock, and vested options.[96] Article IV, Section 4.03(d) of the Certificate is entirely consistent with this structure. It provides that, upon a "Liquidation Event," which includes transactions such as the Merger, the Company must first satisfy the Preferred Stock liquidation preferences and "provide for payment of the debts and other liabilities of the [Company]" before distributing any remaining assets to the holders of Common Stock.[97] The bonuses and other transaction expenses were liabilities of the Company that reduced the amounts

---

[94] For the stock portion, the plaintiffs were entitled to the value of the shares, but the court recognized that there could be different approaches to selecting the measurement date. *Mehta*, 2014 WL 5438534, at *7.

[95] Merger Agreement § 3.1(b).

[96] *Id.* § 3.1(e).

[97] Certificate Art. IV § 4.03(d)−(e).

available for distribution to the common stockholders.[98] As a result, of the $4.5 million placed in escrow, $3,919,864 was ultimately released, with the remainder used to satisfy escrow-related obligations.[99]

OnSolve calculates Chertok's entitlement as a per-share merger price of approximately $2.44598 applied to 188,994 shares, which equals $462,275.83, plus a pro rata share of the amount actually released from escrow in the amount of $7,237.36.[100] Plaintiffs have not shown that the Merger Agreement was misapplied to them or that their pro rata share of the net proceeds was miscalculated. Plaintiffs' theory instead seeks to reprice the transaction by insulating them from deductions that applied to all other stockholders. As Defendant indicated, if Plaintiffs' contention were accepted, "no deal [would] ever happen because . . . anyone who is smart, [] would [] dissent, submit an appraisal and then withdraw it, . . . [to] get a better deal."[101] That is incompatible with the Merger deal structure and Delaware law.

The Merger Agreement governs the amount of Merger consideration to which Chertok was entitled when he withdrew his appraisal demand, which the Company unlawfully conditioned upon execution and delivery of the Joinder Agreement. The

---

[98] Merger Agreement § 1.1.

[99] Tr. 73:15−16, 73:21.

[100] *Id.* at 74:15−75:22.

[101] *Id.* at 69:23−70:3.

Certificate does not give Chertok the right to a higher, differently computed amount. Chertok is entitled to $469,513.19, comprising his portion of the Merger consideration and his portion of the released escrow amounts. In addition, as the parties agree, Chertok is owed distributions in the amount of $29,044.83. Therefore, Chertok is entitled to damages in the amount of $498,558.02.

## B. Prejudgment Interest

Plaintiffs seek an award of prejudgment interest from July 29, 2017, the date they withdrew their appraisal demand, through the date of judgment.[102] They request prejudgment interest at a rate of 8.625%, compounded monthly.[103] Under Delaware law, the legal rate of interest is five percentage points above the federal discount rate. 6 *Del. C.* § 2301(a). "In the absence of an express contract rate, Delaware courts use the 'legal rate' as a default rate." *In re Bremerton Cellular Tel. Co. Litig.*, 328 A.3d 330, 353 (Del. Ch. 2024) (citation omitted). Plaintiffs' proposed rate of 8.625% is the average of the 6.75% legal rate in effect on July 29, 2017, when Plaintiffs withdrew the appraisal demand, and the 10.5% legal rate in effect at the time of the trial.[104]

---

[102] Pls.' Opening Br. 20–21, 34; Pls.' Reply Br. 19; Post-Trial Arg. at 8:11–16, 41:12−20.

[103] Pls.' Opening Br. 21 & n.16; Pls.' Reply Br. 19–21; Post-Trial Arg. at 8:17–23.

[104] Tr. 43:17−44:8, 45:6−9; *see also id.* at 45:19−46:4 (providing for a formula to calculate prejudgment interest).

Defendant counters that the court "should exercise its discretion to deny interest altogether" because Chertok "could have had his money in the fall of 2017 with ordinary diligence and reasonableness."[105] Alternatively, Defendant argues that the interest period and the rate of interest should be limited due to Plaintiffs' delay in requesting payment, their rejection of OnSolve's check that was delivered immediately after the filing of the Complaint, and Plaintiffs' delays in pursuing this litigation.[106]

As the Delaware Supreme Court recently emphasized, "prejudgment interest is awarded as a matter of right, not by judicial discretion." *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2026 WL 935618, at *16 (Del. Apr. 7, 2026). "Prejudgment interest serves two purposes"—one compensatory and one restitutionary. *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011). "[F]irst, [prejudgment interest] compensates the plaintiff for the loss of use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim." *Id.*

Because Chertok has prevailed on his breach of contract claim, he is entitled to prejudgment interest as a matter of right. This court has no discretion to deny it. But this court, as a court of equity, has discretion "to decide what rate of interest

---

[105] Def.'s Post-Trial Br. 23; Post-Trial Arg. at 26:12–13.

[106] Def.'s Post-Trial Br. 23; Post-Trial Arg. at 23:2–5, 26:9–11, 26:14–20.

applies when awarding prejudgment interest." *LG Elecs.*, 2026 WL 935618, at \*16.

In particular, "this [c]ourt has the discretion to reduce prejudgment interest for 'delay that is the fault or responsibility of a plaintiff or his attorney,' [with] such a reduction [] typically [being] reserved for situations involving 'inordinate' or deliberate delay." *Williams Cos., Inc. v. Energy Transfer LP*, 2022 WL 3650176, at \*7 (Del. Ch. Aug. 25, 2022) (citation modified), *aff'd*, 2023 WL 6561767 (Del. Oct. 10, 2023) (TABLE). Moreover,

> [a]lthough the legal rate has historically been considered as the 'benchmark' for prejudgment interest, the Court of Chancery has broad discretion to determine the appropriate rate of interest, and may award a different rate. The decision to award a particular rate of interest is within the sound discretion of the Court of Chancery.

*Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 226 (Del. 2005).

Here, Plaintiffs waited almost three full years before demanding payment of the Merger consideration. After filing suit, Defendant sought to resolve the litigation by tendering a check in the amount that it believed Plaintiffs were due under the terms of the Merger Agreement and abandoned its prior condition to supply the Required Deliveries. Once Chertok filed suit, he was within his rights to reject the check as an insufficient settlement offer because it did not include prejudgment interest, which OnSolve indicated it would not pay. Nevertheless, other than prejudgment interest, the overall amount in dispute in this case was relatively small,

27

even if Chertok had prevailed on his theory that he could avoid deductions for management bonuses and escrows.

Chertok delayed in pressing his claims. He pursued overly broad and ultimately unproductive discovery requests and advanced legal theories that did not narrow the issues for resolution.[107] Despite years of litigation, discovery was minimal: the parties completed only a limited document production, took no depositions, and presented no witnesses at trial. There were extended periods of inactivity attributable to Plaintiffs' failure to press their claims.[108] Plaintiffs prolonged that delay when their original counsel withdrew in April 2022, and they did not retain substitute counsel until May 30, 2023.[109] Because SDTC is an entity, it could not proceed *pro se* and therefore was unable to pursue its claims until substitute counsel appeared. *See Transpolymer Indus., Inc. v. Chapel Main Corp.*, 582 A.2d 936 (Del. 1990) ("In Delaware, a corporation or other entity can act before a court only through an agent duly licensed to practice law." (citation omitted)); *accord World Award Found. Inc. v. Anbang Ins. Grp. Co.*, 240 A.3d 1139 (Del. 2020). In addition, Chertok put off post-trial briefing for five months.[110]

---

[107] *See* Dkts. 21, 23, 26, 33, 37, 45, 56–57, 60, 62, 66–67, 69.

[108] Post-Trial Arg. at 23:2–24:14.

[109] Dkts. 28, 38.

[110] Dkts. 82, 84, 94–95.

Under these circumstances, an award of simple—rather than compound—interest is warranted. Therefore, in the exercise of the court's discretion, the court awards prejudgment interest at 6.75%, which was the legal rate on July 29, 2017, when Chertok was entitled to payment of the Merger consideration.

### C.    Attorneys' Fees

"Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation." *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998). "The courts of this nation, including th[e] [Delaware Supreme] Court, have recognized several exceptions to the American Rule." *Id.* One of these exceptions "is the bad faith exception." *Id.* "[C]ourts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Id.* at 546 (citation modified).

Plaintiffs request attorneys' fees, arguing that Defendant engaged in bad faith during the litigation, causing delays.[111] Plaintiffs have not shown that Defendant acted in bad faith during this litigation. Plaintiffs have not otherwise established a basis for fee-shifting under any recognized exception to the American Rule. Therefore, their request for attorneys' fees is denied.

---

[111] Pls.' Opening Br. 5, 7; Tr. 32:22−23, 54:6−55:3; *see also* Post-Trial Arg. at 11:15–6, 28:10–24, 43:3–11.

## III. CONCLUSION

Judgment will be entered in favor of Plaintiff Chertok on his claim for breach of contract.

Chertok is awarded $498,558.02 in damages. Chertok is awarded simple interest on the damages award from July 29, 2017, through the date of judgment at the rate of 6.75%. Plaintiffs' request for an award of attorneys' fees under the bad-faith exception to the American Rule is denied.

The parties shall confer and submit a form of implementing order consistent with this memorandum opinion within five business days.